RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0003p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SHARI GUERTIN, individually and as next friend of her child, E.B., a minor; DIOGENES MUSE-CLEVELAND,

*Plaintiffs-Appellees*,

*v.*

STATE OF MICHIGAN, et al.,

*Defendants*,

CITY OF FLINT, MICHIGAN, HOWARD CROFT, DARNELL EARLEY, and GERALD AMBROSE (17-1699); LIANE SHEKTER-SMITH, DANIEL WYANT, STEPHEN BUSCH, MICHAEL PRYSBY, and BRADLEY WURFEL (17-1745); NANCY PEELER (17-1752); ROBERT SCOTT (17-1769); EDEN WELLS and NICK LYON (17-1698),

*Defendants-Appellees.*

Nos. 17-1698 /1699 /1745 /1752 /1769

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:16-cv-12412—Judith E. Levy, District Judge.

Argued: June 6, 2018

Decided and Filed: January 4, 2019

Before: McKEAGUE, GRIFFIN, and WHITE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Zachary C. Larsen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants in 17-1698. Frederick A. Berg, Jr., BUTZEL LONG, P.C., Detroit, Michigan, for Appellants in 17-1699. John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, for Appellants in 17-1745. Michael S. Cafferty, Detroit, Michigan, for Appellant in 17-1752. Kurt Krause, CHARTIER & NYAMFUKUDZA, P.L.C., East Lansing, Michigan, for Appellant in 17-1769. Paul T. Geske, MCGUIRE LAW, P.C., Chicago, Illinois, for Appellees. Samuel R. Bagenstos, Ann Arbor, Michigan, for Amicus Curiae.

**ON BRIEF:** Zachary C. Larsen, Richard S. Kuhl, Margaret A. Bettenhausen, Nathan A. Gambill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants in 17-1698. Frederick A. Berg, Jr., Sheldon H. Klein, BUTZEL LONG, P.C., Detroit, Michigan, Nikkiya T. Branch, PERKINS LAW GROUP, Detroit, Michigan, Alexander S. Rusek, WHITE LAW PLLC, Okemos, Michigan, William Y. Kim, CITY OF FLINT, Flint, Michigan, Barry A. Wolf, LAW OFFICE OF BARRY A. WOLF PLLC, Flint, Michigan, for Appellants in 17-1699. John J. Bursch, BURSCH LAW PLLC, Caledonia, Michigan, Philip A. Grashoff, Jr., KOTZ SANGSTER WYSOCKI P.C., Bloomfield Hills, Thaddeus E. Morgan, Michael H. Perry, FRASER TREBILCOCK, Lansing, Michigan, Charles E. Barbieri, Allison M. Collins, FOSTER, SWIFT, COLLINS & SMITH, P.C., Lansing, Michigan, Jay M. Berger, Michael J. Pattwell, Jordan S. Bolton, Christopher B. Clare, CLARK HILL PLC, Detroit, Michigan, for Appellants in 17-1745. Michael S. Cafferty, Detroit, Michigan, for Appellant in 17-1752. Mary Chartier, CHARTIER & NYAMFUKUDZA, P.L.C., East Lansing, Michigan, for Appellant in 17-1769. Paul T. Geske, MCGUIRE LAW, P.C., Chicago, Illinois, Steven Hart, HART, MCLAUGHLIN & ELDRIDGE, LLC, Chicago, Illinois, John Sawin, SAWIN LAW FIRM, LTD., Chicago, Illinois, for Appellees. Samuel R. Bagenstos, Ann Arbor, Michigan, for Amicus Curiae. Richard S. Kuhl, Margaret A. Bettenhausen, Nathan A. Gambill, Zachary C. Larsen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Amicus Curiae in 17-1699.

GRIFFIN, J., delivered the opinion of the court in which WHITE, J., joined, and McKEAGUE, J., joined in part. McKEAGUE, J. (pp. 40–70), delivered a separate opinion concurring in part and dissenting in part.

—————————————

**OPINION**

—————————————

GRIFFIN, Circuit Judge.

This case arises out of the infamous government-created environmental disaster commonly known as the Flint Water Crisis. As a cost-saving measure until a new water authority was to become operational, public officials switched the City of Flint municipal water supply from the Detroit Water and Sewerage Department (DWSD) to the Flint River to be processed by an outdated and previously mothballed water treatment plant. With the approval of State of Michigan regulators and a professional engineering firm, on April 25, 2014, the City began dispensing drinking water to its customers without adding chemicals to counter the river water's known corrosivity.

The harmful effects were as swift as they were severe. Within days, residents complained of foul smelling and tasting water. Within weeks, some residents' hair began to fall out and their skin developed rashes. And within a year, there were positive tests for E. coli, a spike in deaths from Legionnaires' disease, and reports of dangerously high blood-lead levels in Flint children. All of this resulted because the river water was 19 times more corrosive than the water pumped from Lake Huron by the DWSD, and because, without corrosion-control treatment, lead leached out of the lead-based service lines at alarming rates and found its way to the homes of Flint's residents. The crisis was predictable, and preventable. *See generally Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 387 (6th Cir. 2016).

I.

Plaintiffs Shari Guertin, her minor child E.B., and Diogenes Muse-Cleveland claim personal injuries and damages from drinking and bathing in the lead-contaminated water. Plaintiffs' complaint asserted various claims against numerous state, city, and private-actor defendants. In response to motions to dismiss, the district court granted in part and denied in part the motions. In its written order, the court dismissed many of the original claims and original defendants. Plaintiffs have not filed a cross appeal. The defendants who were not dismissed now appeal and are collectively referred to as "defendants" throughout this opinion. The plaintiffs' sole remaining claim is that defendants violated their right to bodily integrity as guaranteed by the Substantive Due Process Clause of the Fourteenth Amendment. They bring this claim pursuant to 42 U.S.C. § 1983, under which "an individual may bring a private cause of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012).

II.

On this appeal, we decide two substantial issues of public importance. First, viewing each defendant individually, did the district court err in denying defendants' motions to dismiss based upon qualified immunity? Specifically, did plaintiffs plead a plausible Fourteenth Amendment Due Process violation of their right to bodily integrity and was such a constitutional

right clearly established when the defendants acted?  We join the United States District Court for the Eastern District of Michigan, *In re Flint Water Cases*, 329 F. Supp. 3d 369 (E.D. Mich. 2018), *vacated on other grounds* (Nov. 9, 2018), and *Guertin v. Michigan*, 2017 WL 2418007 (E.D. Mich. June 4, 2017), the Michigan Court of Appeals, *Mays v. Snyder*, 916 N.W.2d 227 (Mich. Ct. App. 2018), and the Michigan Court of Claims, *Mays v. Snyder*, No. 16-000017-MM (Mich. Ct. Cl. Oct. 26, 2016),[1] in holding that plaintiffs have pled a plausible Due Process violation of bodily integrity regarding some of the defendants.  For the reasons that follow, we affirm the district court's order denying the motions to dismiss based upon qualified immunity regarding defendants Howard Croft, Darnell Earley, Gerald Ambrose, Liane Shekter-Smith,[2] Stephen Busch, Michael Prysby, and Bradley Wurfel.  However, we reverse the denial of the motions to dismiss regarding defendants Daniel Wyant, Nick Lyon, Eden Wells, Nancy Peeler, and Robert Scott because plaintiffs' complaint alleges mere negligence, and not a constitutional violation against them.

The second issue is whether the City of Flint is entitled to Eleventh Amendment immunity from plaintiffs' suit because the takeover by the State of Michigan of the City of Flint pursuant to Michigan's "Emergency Manager" law transformed the City into an arm of the state. It is not, and we therefore affirm the district court's same holding.

### III.

We possess jurisdiction under 28 U.S.C. § 1291 and the "collateral-order doctrine," as defendants are appealing the denial of qualified and Eleventh Amendment immunity.  *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017).  The district court granted in part and denied in part defendants' motions to dismiss plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6).  Given this procedural posture, we construe the complaint in the light most favorable to plaintiffs, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in plaintiffs' favor.  *Crosby v. Univ. of Ky.*, 863 F.3d 545, 551–52 (6th Cir. 2017).  But if we are

---

[1]The Michigan Court of Appeals and Michigan Court of Claims construed the Due Process Clause of the Michigan Constitution and, following Michigan precedent, deemed it coextensive with its federal counterpart.  *See, e.g.*, *Mays*, 916 N.W.2d at 261.

[2]We have changed the docket to correct plaintiffs' misspelling of Shekter-Smith's name.

to affirm, the factual allegations in plaintiffs' complaint must plausibly allege a legally recognized constitutional claim. *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–58 (2007).

## IV.

Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It is not a "mere defense to liability"; the doctrine provides "*immunity from suit*." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). This immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). A plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). To do so, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). The district court concluded plaintiffs met this standard, and we review that decision de novo. *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 871 (6th Cir. 2012).

The assertion of qualified immunity at the motion-to-dismiss stage pulls a court in two, competing directions. On the one hand, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). But on the other, "[w]hen qualified immunity is asserted at the pleading stage," as defendants did here, "the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Id.* at 238–39 (citation omitted). We have thus cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although . . . entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (internal citations, quotation marks, and

brackets omitted).  The reasoning for our general preference is straightforward:  "Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not" for purposes of determining whether a right is clearly established.  *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) (brackets omitted).

V.

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  Flowing directly from the protections enshrined in the Magna Carta, *see, e.g.*, *Lewellen v. Metro. Gov't of Nashville & Davidson Cty.*, 34 F.3d 345, 348 (6th Cir. 1994), the Due Process Clause significantly restricts government action—its core is "prevent[ing] government from abusing its power, or employing it as an instrument of oppression."  *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (internal quotation marks and brackets omitted); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) ("The touchstone of due process is protection of the individual against arbitrary action of government, [including] the exercise of power without any reasonable justification in the service of a legitimate government objective." (internal quotation marks omitted)).  Although the Clause provides no guarantee "of certain minimal levels of safety and security," it expressly prohibits deprivations by "the State itself." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  That is, "[i]ts purpose [is] to protect the people from the State, not to ensure that the State protect[] them from each other." *Id.* at 196.

There are procedural and substantive due process components.  *See Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014).  Only the latter component is at issue here.  Substantive due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986).  It "specifically protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would

exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal quotation marks and citations omitted). The liberty interests secured by the Due Process Clause "include[] the right 'generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.'" *Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). These common-law privileges, the Supreme Court has held, specifically embrace the right to bodily integrity, *Glucksberg*, 521 U.S. at 720, and the right not to be subjected to arbitrary and capricious government action that "shocks the conscience and violates the decencies of civilized conduct." *Lewis*, 523 U.S. at 846–47 (internal quotation marks omitted).

The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins*, 503 U.S. at 125. Substantive Due Process is not "a rigid conception, nor does it offer recourse for every wrongful action taken by the government." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 862 (6th Cir. 2012). As such, it "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels*, 474 U.S. at 332. That means a "'careful description' of the asserted fundamental liberty interest" is essential, *Glucksberg*, 521 U.S. at 721 (citation omitted), otherwise the Clause would turn into "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Daniels*, 474 U.S. at 332 (citation omitted). Accordingly, we "focus on the allegations in the complaint to determine how [plaintiffs] describe[] the constitutional right at stake and what the [defendants] allegedly did to deprive [them] of that right." *Collins*, 503 U.S. at 125.

## A.

Plaintiffs' complaint deals with the scope of the right to bodily integrity, an indispensable right recognized at common law as the "right to be free from . . . unjustified intrusions on personal security" and "encompass[ing] freedom from bodily restraint and punishment." *Ingraham*, 430 U.S. at 673–74; *see also Davis v. Hubbard*, 506 F. Supp. 915, 930 (N.D. Ohio

1980) ("In the history of the common law, there is perhaps no right which is older than a person's right to be free from unwarranted personal contact." (collecting authorities)).

This common law right is first among equals. As the Supreme Court has said: "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891); *cf. Schmerber v. California*, 384 U.S. 757, 772 (1966) ("The integrity of an individual's person is a cherished value of our society."). Absent lawful authority, invasion of one's body "is an indignity, an assault, and a trespass" prohibited at common law. *Union Pac. Ry.*, 384 U.S. at 252. On this basis, we have concluded "[t]he right to personal security and to bodily integrity bears an impressive constitutional pedigree." *Doe v. Claiborne Cty.*, 103 F.3d 495, 506 (6th Cir. 1996).

"[T]his right is fundamental where 'the magnitude of the liberty deprivation that the abuse inflicts upon the victim strips the very essence of personhood.'" *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998) (quoting *Doe*, 103 F.3d at 506–07) (brackets and ellipsis omitted). "We have never retreated . . . from our recognition that *any* compelled intrusion into the human body implicates significant, constitutionally protected . . . interests." *Missouri v. McNeely*, 569 U.S. 141, 159 (2013) (emphasis added); *see also Rochin v. California*, 342 U.S. 165, 172 (1952) (forcibly pumping a detainee's stomach to obtain evidence was "too close to the rack and the screw to permit of constitutional differentiation"). And more broadly, it is beyond debate that an individual's "interest in preserving her life is one of constitutional dimension." *Nishiyama v. Dickson Cty.*, 814 F.2d 277, 280 (6th Cir. 1987) (en banc), *abrogated on other grounds as recognized in Jones v. Reynolds*, 438 F.3d 685, 694–95 (6th Cir. 2006).

Bodily integrity cases "usually arise in the context of government-imposed punishment or physical restraint," but that is far from a categorical rule. *Kallstrom*, 136 F.3d at 1062 (collecting cases). Instead, the central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body. *See, e.g.*,

*Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 269–70 (1990). Thus, to show that the government has violated one's right to bodily integrity, a plaintiff need not "establish any constitutional significance to the means by which the harm occurs[.]" *Boler v. Earley*, 865 F.3d 391, 408 n.4 (6th Cir. 2017). That is because "individuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest." *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012).

A few examples illustrate the breadth of this tenet. Consider *Washington v. Harper*, which addressed the State of Washington's involuntary administration of antipsychotic medication to an inmate without a judicial hearing. 494 U.S. 210, 213–17 (1990). There, the Supreme Court had "no doubt" that the inmate "possess[ed] a significant liberty interest in avoiding unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221–22. This "interest in avoiding the unwarranted administration of antipsychotic drugs is not insubstantial. The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229 (citing *Winston v. Lee*, 470 U.S. 753 (1985), and *Schmerber*, 384 U.S. 757). And this is especially so when the foreign substance "can have serious, even fatal, side effects" despite some therapeutic benefits. *Id.* But the extent of this interference, reasoned the Court, is circumscribed by the government's interest (there, administering medication in the custodial setting). *Id.* at 222–27. Examining those interests, the Court permitted the physical intrusion upon a showing of certain circumstances—danger to self or others, and in the inmate's medical interest. *Id.* at 227; *see also Riggins v. Nevada*, 504 U.S. 127, 135–38 (1992) (applying *Harper* to the forced administration of drugs in trial and pretrial settings and focusing upon the state's "overriding justification and a determination of medical appropriateness" to justify the intrusion); *Sell v. United States*, 539 U.S. 166, 177–86 (2003) (similar).

The Supreme Court's seminal "right to die" case, *Cruzan v. Director, Missouri Department of Health*, provides further explication. At issue in *Cruzan* was whether the parents of an individual in a persistent vegetative state could insist that a hospital withdraw life-sustaining care based on her right to bodily integrity. 497 U.S. at 265–69. Writing for the Court, Chief Justice Rehnquist extensively detailed the line between the common law, informed

consent, and the right to bodily integrity: "This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment," *id.* at 269, "generally encompass[es] the right of a competent individual to refuse medical treatment," *id.* at 277, and is a right that "may be inferred from [the Court's] prior decisions." *Id.* at 278–79 (citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Breithaupt v. Abram*, 352 U.S. 432 (1957); *Harper*, 494 U.S. 210; *Vitek v. Jones*, 445 U.S. 480 (1980); and *Parham v. J.R.*, 442 U.S. 584 (1979)). And, although the Court assumed as much, "the logic of [these] cases . . . embrace[s] . . . a liberty interest" in "artificially delivered food and water essential to life." *Id.* at 279. As with *Harper*, the Court's main inquiry was not whether the case dealt with the right to bodily integrity, but rather how to balance this right with a competing state interest (the protection of life) in relation to the procedural protections provided (the state's requirement that an incompetent person's wishes to withdraw treatment be proven by clear and convincing evidence). *Id.* at 280–87; *cf. Winston*, 470 U.S. at 759 (holding that a non-consensual "surgical intrusion into an individual's body for evidence" without a compelling state need is unreasonable).

This nonconsensual intrusion vis-à-vis government interest line of cases has played out time and time again in the lower courts. *See, e.g.*, *United States v. Brandon*, 158 F.3d 947, 953 (6th Cir. 1998) ("[T]he issue of forced medication implicates . . . [the] liberty interest in being free from bodily intrusion.").[3] The numerous cases involving government experiments on unknowing and unwilling patients provide a strong analogy to the Flint Water Crisis.[4] Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection.

_____

[3]Some defendants contend actual and targeted physical force by a government actor is requisite for a bodily integrity invasion. But as set forth, the right to bodily integrity's anchor is control of one's own person by way of informed consent, and thus the method upon which the government enters the body is irrelevant. *Boler*, 865 F.3d at 408 n.4; *see also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 857 (1992) (plurality op).

[4]*See, e.g., Barrett v. United States*, 798 F.2d 565 (2d Cir. 1986); *Lojuk v. Quandt*, 706 F.2d 1456 (7th Cir. 1983); *Rogers v. Okin*, 634 F.2d 650 (1st Cir. 1980), *overruled on other grounds sub nom*, *Mills v. Rogers*, 457 U.S. 291 (1982); *Bounds v. Hanneman*, 2014 WL 1303715 (D. Minn. Mar. 31, 2014); *Heinrich v. Sweet*, 62 F. Supp. 2d 282 (D. Mass. 1999); *Stadt v. Univ. of Rochester*, 921 F. Supp. 1023 (W.D.N.Y. 1996); *In re Cincinnati Radiation Litigation*, 874 F. Supp. 796 (S.D. Ohio 1995); *Davis v. Hubbard*, 506 F. Supp. 915 (N.D. Ohio 1980).

*In re Cincinnati Radiation Litigation* is a good example.  Funded by the Department of Defense, government officials at the University of Cincinnati subjected cancer patients to radiation doses consistent with those expected to be inflicted upon military personnel during a nuclear war.  874 F. Supp. at 802–04.  The patients were in "reasonably good clinical condition," and were "primarily indigent, poorly educated, and of lower than average intelligence."  *Id.* at 803.  At no time did the government actors disclose the risks associated with the massive radiation doses or obtain consent to irradiate the patients at those levels for those purposes—they instead told the patients that the radiation was treatment for their cancer.  *Id.* at 803–04. Summarizing the caselaw just mentioned, the *Cincinnati Radiation* court easily concluded that "[t]he right to be free of state-sponsored invasion of a person's bodily integrity is protected by the Fourteenth Amendment guarantee of due process."  *Id.* at 810–11.  The involuntary and misleading nature of the intrusions was key.  The patients could not "be said to exercise that degree of free will that is essential to the notion of voluntariness" because:

> [t]he choice Plaintiffs would have been forced to make was one of life or death. If the Constitution protects personal autonomy in making certain types of important decisions, the decision whether to participate in the Human Radiation Experiments was one that each individual Plaintiff was entitled to make freely and with full knowledge of the purpose and attendant circumstances involved. Without actually seizing the Plaintiffs and forcing them to submit to these experiments, the . . . agents of the state[] accomplished the same feat through canard and deception[.]

*Id.* at 812 (internal quotation marks and citations omitted).  Also key was the risk of harm—the plaintiffs received "total and partial body radiation, which caused burns, vomiting, diarrhea and bone marrow failure, and resulted in death or severe shortening of life."  *Id.* at 814.

We find the *Cincinnati Radiation* matter especially analogous.  In both instances, individuals engaged in voluntary actions that they believed would sustain life, and instead received substances detrimental to their health.  In both instances, government officials engaged in conduct designed to deceive the scope of the bodily invasion.  And in both instances, grievous harm occurred.  Based on the facts and principles set forth in the above cases, we therefore agree with the district court that "a government actor violates individuals' right to bodily integrity by

knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit."

Finally, we note what plaintiffs' claim does not entail. There is, of course, "'no fundamental right to water service.'" *In re City of Detroit*, 841 F.3d 684, 700 (6th Cir. 2016) (quoting *Golden v. City of Columbus*, 404 F.3d 950, 960 (6th Cir. 2005)). Moreover, the Constitution does not guarantee a right to live in a contaminant-free, healthy environment. *See, e.g.*, *Lake v. City of Southgate*, 2017 WL 767879, at *4 (E.D. Mich. Feb. 28, 2017) (collecting cases). To this end, several defendants and the dissent cite a California state case involving residents complaining about a city fluoridating its drinking water supply. *See Coshow v. City of Escondido*, 132 Cal. App. 4th 687, 709 (2005). However, *Coshow* is particularly inapposite because it shows the push-and-pulls of competing policy decisions that generally fall outside the scope of a violation of the right to bodily integrity—there, the government publicly introduced fluoride into the water system, a chemical frequently added to public water systems to prevent tooth decay. Here, defendants make no contention that causing lead to enter Flint's drinking water was for the public good or that they provided notice to Flint residents about the lead-laced water. Therefore, "*Coshow* did not address whether substantive due-process protections might be implicated in the case of intentional introduction of known contaminants by governmental officials, and its reasoning is inapplicable here." *Mays*, 916 N.W.2d at 262 n.16.

B.

Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant. *See Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011) ("[A] plaintiff must demonstrate a deprivation of a constitutionally protected liberty or property interest in order to establish a due process violation based on discretionary conduct of government officials[.]"). We use the "shocks the conscience" rubric to evaluate intrusions into a person's right to bodily integrity. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996). Thus, a "plaintiff must show as a predicate the deprivation of a liberty or property interest" and conscience-shocking conduct. *See EJS Props.*, 698 F.3d at 861;

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (holding that conscience-shocking behavior must be taken "towards the plaintiff's federally protected rights"); *see also Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015) ("To sustain a substantive due process claim, a plaintiff must show that the particular interest in question is protected by the Fourteenth Amendment and that the government's deprivation of that interest 'shocks the conscience.'"); *United States v. Sanders*, 452 F.3d 572, 577 n.4 (6th Cir. 2006) (similar); *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) (similar).[5]

"[T]he measure of what is conscience shocking is no calibrated yard stick," nor is it "subject to mechanical application." *Lewis*, 523 U.S. at 847, 850. Several "tropes" help explain its meaning, *Range*, 763 F.3d at 589, with the focus again being on "executive abuse of power." *Lewis*, 523 U.S. at 846. *Rochin* is the "benchmark." *Id.* at 846–47. Due-process-violative conduct (there, forced stomach pumping to obtain evidence) "shocks the conscience," infringes upon the "decencies of civilized conduct," is "so brutal and so offensive to human dignity," and interferes with rights "implicit in the concept of ordered liberty." *Rochin*, 342 U.S. at 169, 172–74 (citation omitted); *see also Lewis*, 523 U.S. at 846–47 (collecting authorities). "These are subjective standards, to be sure, but they make clear that the 'shocks the conscience' standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation." *Range*, 763 F.3d at 590. Stated differently, the shocks-the-conscience test is the way in which courts prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees.

---

[5]In dicta, we stated in *Range* that "[o]ur case law on substantive due process is somewhat conflicted as to whether an underlying constitutionally-protected right must be established in order for a government action to violate one's rights by shocking the conscience," and then cited *EJS Properties* for the proposition that in non-zoning decision contexts "we have held that 'government action may certainly shock the conscience or violate substantive due process without a liberty or property interest at stake.'" 763 F.3d at 589 (quoting *EJS Props.*, 698 F.3d at 861–62). For that statement, *EJS Properties*, in dicta as well, cited two pre-*Lewis* cases, and more importantly, *American Express*—a case involving a constitutional challenge to a state law. 698 F.3d at 861–62. *Range*'s and *EJS Properties*' dicta misconstrue *American Express*, which expressly held "a plaintiff must demonstrate a deprivation of a constitutionally protected liberty or property interest in order to establish a due process violation based on discretionary conduct of government officials," unless the matter involves a constitutional challenge to a state law. *Am. Express*, 641 F.3d 688–89 (citation omitted). This is consistent with *Lewis*. 523 U.S. at 847 n.8.

To aid this inquiry, we are to place the alleged heinous conduct on a spectrum, "[t]he bookends [of which] present the easier cases." *Id.* On the one end is conduct that "is categorically beneath the threshold of constitutional due process," mere negligence. *Lewis*, 523 U.S. at 849. Conduct that is "intended to injure in some way unjustifiable by any government interest" represents the other end, for this behavior "would most probably support a substantive due process claim." *Id.* We deal here not with these extremes, but rather in the middle, what the Court has deemed "something more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Id.* (internal quotation marks omitted).

This "middle state[] of culpability 'may or may not be shocking depending on the context,'" *Range*, 763 F.3d at 590 (quoting *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008)), for what may "constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial," *Lewis*, 523 U.S. at 850 (quoting *Betts v. Brady*, 316 U.S. 455, 462 (1942)). "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.*

*Lewis* delineates this dichotomy. The issue there was "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Id.* at 836. The Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment . . . ." *Id.* at 854. In so holding, the Court highlighted how the time to deliberate in one circumstance may dictate liability in one situation but not another because "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical[.]" *Id.* at 851. Take a classic deliberate indifference situation—when, for example, a prison official has "time to make unhurried judgments, [with] the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853. It is in these kinds of situations where we would expect plaintiffs asserting

substantive due process claims based on deliberate indifference to be most successful. In rapidly evolving situations like prison riots, high-speed chases, and other tense, split-second-reaction-demanding matters, we apply "a much higher standard." *Id.* at 852–54. We look instead to whether the state actor applies force "maliciously and sadistically for the very purpose of causing harm"—in other words, whether he acted with an intent to harm. *Id.* at 853.

"The critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (internal quotation marks and brackets omitted). This "time to deliberate consideration," however, does not "transform any reckless action from a tort to conscience-shocking behavior simply because the government actor had time to appreciate *any* risk of harm. Time is instead one element in determining whether the actor's culpability 'inches close enough to harmful purpose to spark the shock that implicates' substantive due process." *Range*, 763 F.3d at 590 (quoting *Lewis*, 523 U.S. at 853) (brackets omitted). Our focus instead is upon the entirety of the situation—"the type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm are all necessary factors in determining whether an official was deliberately indifferent." *Id.* at 591.

After *Lewis*, "the key variable is whether actual deliberation is practical, not whether the claimant was in state custody." *Ewolski*, 287 F.3d at 510 n.5. This is because "[c]ustodial settings . . . are not the only situations in which officials may have a reasonable opportunity to deliberate." *Id.* But more importantly, even in non-custodial situations, we have stressed that deliberate indifference claims require "something more":

> [A] something that we have variously described as callous disregard for the risk of injury, or action in an arbitrary manner that shocks the conscience or that indicates an intent to injure. That additional element—be it termed callous disregard or intent to injure—ensures that only the most egregious official conduct can be said to be arbitrary in the constitutional sense.

*Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005) (internal citations, quotation marks, and brackets omitted).

We have identified a multitude of considerations when evaluating an official's alleged arbitrariness in the constitutional sense, including the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act. *Hunt*, 542 F.3d at 536. These factors help elucidate *Lewis*'s broader point that simply making bad choices does not rise to the level of deliberate indifference. Rather, "[f]or us to find deliberate indifference, . . . we must find not only that the governmental actor chose to act (or failed to act) despite a subjective awareness of substantial risk of serious injury, but we also must make some assessment that he did not act in furtherance of a countervailing governmental purpose that justified taking that risk." *Id.* at 541; *see also Schroder*, 412 F.3d at 729 ("Many, if not most, governmental policy choices come with risks attached to both of the competing options, and yet 'it is not a tort for government to govern' by picking one option over another." (citation omitted)). "Essentially, the more voluntary the plaintiff-government relationship, or the less time the state actor has to deliberate, or the greater the extent to which the state actor is pursuing a legitimate end, the less arbitrary we should deem a bodily injury or death caused by the state actor." *Durham v. Estate of Losleben*, 744 F. App'x 268, 271 (6th Cir. 2018). We agree with the district court that these considerations weigh in favor of finding that the generally alleged conduct was so egregious that it can be said to be "arbitrary in the constitutional sense." [6]

*Extensive time to deliberate.* There is no doubt that the lead-contamination inflicted upon the people of Flint was a predictable harm striking at the core of plaintiffs' bodily integrity, and

---

[6]Several defendants suggest we should depart from this line of authorities and instead reject plaintiffs' claim on the basis of the Supreme Court's pre-*Lewis* decision in *Collins*, where the Supreme Court rejected a substantive due process claim that "the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace" and the city's deliberate indifference to employee safety shocked the conscience. 503 U.S. at 125–26. True, the substantive due process clause "confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual," *DeShaney*, 489 U.S. at 195, nor does it set a floor for the public's right to be safe and secure, *see Collins*, 503 U.S. at 127. But these general principles have no applicability here—this is not a workplace injury case, plaintiffs do not allege Flint was required to provide them with "certain minimal levels of safety and security," *id.*, and *DeShaney* itself makes clear in the same token that injuries *caused* by the state are of a different ilk. 489 U.S. at 195–96. Nor is there a contention that—unlike many public employees hired to perform inherently dangerous jobs who thus "assumed the risk," *Hunt*, 542 F.3d at 538— Flint residents voluntarily consumed the water in the face of likely lead-exposure. For these reasons, our post-*Collins*, pre-*Lewis* caselaw relied upon by defendants is similarly distinguishable. *See, e.g.*, *Lewellen*, 34 F.3d 345; *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448 (6th Cir. 2002).

this known risk cannot be excused on the basis of split-second decision making. All of the alleged decisions by defendants leading up to and during the crisis took place over a series of days, weeks, months, and years, and did not arise out of time-is-of-the-essence necessity. Their "unhurried judgments" were replete with opportunities for "repeated reflection, largely uncomplicated by the pulls of competing obligations," and thus militate in plaintiffs' favor. *Lewis*, 523 at 853; *see also Ewolski*, 287 F.3d at 511–12. In the Court's words, because "[w]hen such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lewis*, 523 U.S. at 853.

*Involuntary relationship.* In addition to the time to deliberate, the relationship between the City of Flint and its residents matters. At the outset, we acknowledge we deal here not with the typical line of voluntary/involuntary relationships that normally occur in our caselaw. Instead, two factors weigh toward an involuntary relationship. First, Flint's transmission of drinking water to its residents is mandatory on both ends—Flint's Charter and Code of Ordinances mandate that the city supply water to its residents, *see, e.g.*, Flint City Charter § 4-203(A), Flint Code of Ord. § 46-7, and as the City expressly argued below, "residents are legally required to take and pay for the water, unless they use an approved spring or well." *See* Flint Code of Ord. §§ 46-50(b), 46-51, 46-52. Second, various defendants' assurances of the water's potability hid the risks, turning residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination. As the district court aptly reasoned, "[m]isleading Flint's residents as to the water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River—is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional." (Citations omitted).[7]

*No legitimate government purpose.* The decision to temporarily switch Flint's water source was an economic one and there is no doubt that reducing cost is a legitimate government purpose. *See, e.g.*, *Garrett v. Lyng*, 877 F.2d 472, 476 (6th Cir. 1989). When a government acts

---

[7]*See also Briscoe v. Potter*, 355 F. Supp. 2d 30, 45–47 (D.D.C. 2004) (holding that plaintiffs sufficiently alleged conscience-shocking conduct where defendants knew a post office distribution center was contaminated with anthrax, made affirmative misrepresentations about the facility's safety, and coerced plaintiffs into continuing to work at the facility).

"for the benefit of the public," normally its deliberate choice does not shock the conscience. *See Hunt*, 542 F.3d at 542. There is a caveat to this general rule—acting merely upon a government interest does not remove an actor's decision from the realm of unconstitutional arbitrariness. *Id.* at 543 ("[W]e have held open the possibility that in extreme cases the governmental actor's choice to endanger a plaintiff in the service of a countervailing duty would be deemed arbitrary[.]"). Here, jealously guarding the public's purse cannot, under any circumstances, justify the yearlong contamination of an entire community. In the words of the Michigan Court of Appeals, "we can conceive of no legitimate governmental objective for this violation of plaintiffs' bodily integrity." *Mays*, 916 N.W.2d at 262. (Some defendants contend their actions were motivated by other legitimate government purposes, and we address their positions below.)

There is no allegation defendants intended to harm Flint residents. Accordingly, the question is whether defendants acted with "[d]eliberate indifference in the constitutional sense," *Range*, 763 F.3d at 591, which we have "equated with subjective recklessness," *Ewolski*, 287 F.3d at 513 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is a particularly high hurdle, for plaintiffs must show the government officials "knew of facts from which they could infer a 'substantial risk of serious harm,' that they did infer it, and that they acted with indifference 'toward the individual's rights.'" *Range*, 763 F.3d at 591 (citation omitted). The deliberate-indifference standard requires an assessment of each defendant's alleged actions individually. *See Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011). Our focus is on each individual defendant's conduct, their "subjective awareness of substantial risk of serious injury," and whether their actions were made "in furtherance of a countervailing governmental purpose that justified taking that risk." *Hunt*, 542 F.3d at 541.

## C.

*Flint defendants (Earley, Ambrose, and Croft)*. We begin with one of the two sets of defendants who were instrumental in creating the crisis—defendants Croft, Emergency Manager Earley, and Emergency Manager Ambrose. These individuals were among the chief architects of Flint's decision to switch water sources and then use a plant they knew was not ready to safely process the water, especially in light of the Flint River's known environmental issues and the

problems associated with lead exposure. Earley, for example, "forced the transition through" despite knowing how important it was that "the treatment plant be ready to treat Flint River water" and that "[t]he treatment plant was not ready." Similarly, Croft permitted the water's flow despite knowing "that the City's water treatment plant was unprepared to adequately provide safe drinking water to Flint's residents." The Flint defendants also made numerous statements to the public proclaiming that the water was safe to drink. Defendant Ambrose's decisions to twice turn down opportunities to reconnect to the DWSD after he knew of the significant problems with the water were especially egregious. These and other asserted actions plausibly allege deliberate indifference and "plain[] incompeten[ce]" not warranting qualified immunity. *al-Kidd*, 563 U.S. at 743 (citation omitted). To the extent these defendants claim "mistakes in judgment" because they reasonably relied upon the opinions of Michigan Department of Environmental Quality (MDEQ) employees and professional engineering firms, *see Pearson*, 555 U.S. at 231, those are facts to be fleshed out during discovery and are not appropriate to resolve at the motion-to-dismiss posture. *See, e.g.*, *Wesley*, 779 F.3d at 433–34.

The dissent concludes that Ambrose and Earley were merely "rel[ying] on expert advice" and therefore their actions could not demonstrate a callous disregard for plaintiffs. However, this conclusion ignores *Wesley*'s guidance not to resolve such issues at the motion-to-dismiss stage. It also ignores our obligation to accept plaintiffs' allegations as true and draw reasonable inferences from those allegations. One can place a benign construction on the factual allegations and draw inferences so that the facts amount to a negligent mismanagement of priorities and risks; but the allegations also support a reasonable inference that Earley prioritized a drive to cut costs with deliberate and reckless indifference to the likely results, and Ambrose refused to reconnect to Detroit water despite knowing the substantial risk to Flint residents' health.

For now, we conclude that plaintiffs' complaint plausibly alleges a constitutional violation as to these defendants.

## D.

*MDEQ Defendants (Busch, Shekter-Smith, Prysby, Wurfel, and Wyant)*. The MDEQ defendants were the other set of individuals front and center during the crisis. The allegations

against defendants Busch, Shekter-Smith, Prysby, and Wurfel are numerous and substantial. These MDEQ defendants played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications. Furthermore, when faced with the consequences of their actions, they falsely assured the public that the water was safe and attempted to refute assertions to the contrary. A few poignant examples further illustrate their culpability:

- Less than two weeks before the switch to Flint water, the Flint water treatment plant's water quality supervisor wrote to Prysby and Busch that he had inadequate staff and resources to properly monitor the water. As a result, he informed Prysby and Busch, "I do not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it will be against my direction." Busch and Prysby did not act on this warning. Instead, a few days later, Busch drafted a talking point for a Flint community meeting that highlighted that MDEQ was "satisfied with the City's ability to treat water from the Flint River."

- After General Motors very publicly stopped using Flint River water at its engine plant for fear of corrosion, Prysby made sure the department's approach was to spin this symptom as not related to public health instead of investigating the underlying problem. He "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production."

- On February 27, 2015, Busch lied when he told "the EPA on behalf of MDEQ that the Flint Water Treatment Plant had an optimized corrosion control program." However, Busch knew "[b]y no later than April 2015, *but likely much earlier* . . . that no corrosion control was being used in Flint following the switch to the Flint River as the water source." (Emphasis added).

- In the midst of the crisis and with full knowledge that Flint's water distribution system was corroded and presented significant health issues, Shekter-Smith callously excused Flint's lack of drinking water compliance as "circumstances happen." And after the EPA pressed MDEQ officials for MDEQ's failure to optimize corrosion controls in July 2015, she requested the EPA nonetheless cover her department's decision by "indicat[ing] in writing . . . [its] concurrence that the city is in compliance with the lead and copper rule . . . ." Doing so, she wrote, "would help distinguish between [MDEQ's] goals to address important public health issues separately from the compliance requirements of the actual rule which we believe have been and continue to be met in the city of Flint." In other words, "technical compliance" trumped addressing an urgent and catastrophic public health disaster.

- On numerous occasions, defendant Wurfel, the public face of the crisis, announced the water was safe to drink, and demeaned, belittled, and aggressively dampened attempts by the scientific community to challenge the government's assertions that Flint did not have a problem with its drinking water. And he suggested that concern regarding the water was at best a short-term problem—that by the time the City had completed its lead-testing, the City would already be drawing from a different water source altogether.

As with the Flint defendants, these MDEQ defendants created the Flint Water environmental disaster and then intentionally attempted to cover-up their grievous decision. Their actions shock our conscience. It is alleged that these defendants acted with deliberate indifference to the plaintiffs' constitutional right to bodily integrity and at a minimum were plainly incompetent.

To the extent these defendants made "honest mistakes in judgment"—in law or fact—in interpreting and applying the Lead and Copper Rule, *see, e.g.*, *Pearson*, 555 U.S. at 231, that defense is again best reserved for after discovery. *See, e.g.*, *Wesley*, 779 F.3d at 433–34. This Rule generally requires public water systems to monitor lead and copper levels and to treat certain elevated levels in accordance with the regulation. 40 C.F.R. § 141.80 *et. seq.* More specifically, it requires a "large system," like Flint, to optimize corrosion control treatment before distribution of water to the public. § 141.81(a)(1). However, MDEQ employees did not follow this dictate; instead, under a "flawed interpretation" of the Rule, they drew up a yearlong sampling program post-switch (broken up into two, six-month monitoring periods) to determine whether corrosion controls were required. In their view, this after-the-fact-wait-and-see approach to corrosion controls allegedly fell within minimum compliance levels of the Rule. Plaintiffs' view is bleaker. They assert MDEQ viewed Flint residents as "guinea pigs" for a year to test lead-compliance theories that were unsupported and unauthorized by the EPA just to pass time until water began flowing from a new water authority. To be sure, plaintiffs' view must be based on reasonable inferences from factual allegations. The district court correctly found that it is.

By the same token, we reject Wurfel's reliance upon two Second Circuit cases involving statements by public officials about the air-quality in lower Manhattan in the days following the September 11 terrorist attacks, *see Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007) and

*Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008), chiefly for the reason that those matters involved the balancing of competing governmental interests—restoring public services and protecting public health—during a time-sensitive environmental emergency. We have no such similar facts here on the face of plaintiffs' complaint.

The dissent again asks us to view plaintiffs' allegations in a light favorable to defendants, arguing that Shekter-Smith, Busch, and Prysby simply "misinterpreted the [EPA's] Lead and Copper Rule" and provided "misguided advice rooted in mistaken interpretations of the law." But plaintiffs' allegations, which we must accept, are that Busch, Shekter-Smith, and Prysby authorized use of Flint River water with knowledge of its contaminants and then deceived others to hide the fact of contamination. Moreover, it is improper to conclude at this stage that Shekter-Smith, Busch, and Prysby merely misinterpreted the Lead and Copper Rule because plaintiffs allege that the EPA informed them that they were not complying with EPA requirements, providing them with a memorandum that "identified the problem, the cause of that problem, and the specific reason the state missed it." In response, "Defendants ignored and dismissed" the memorandum. Although the dissent claims that plaintiffs' factual allegations do not support that Wurfel's statements were knowing lies, that is a reasonable inference from plaintiffs' factual allegations.

We cannot say the same with respect to defendant Director Wyant based on the allegations in the complaint. At most, plaintiffs claim Wyant was aware of some of the issues arising with the water supply post-switch and admitted his department's "colossal failure" after the City reconnected to DWSD. Plaintiffs do not plausibly allege Wyant personally made decisions regarding the water-source switch, nor do they allege he personally engaged in any other conduct that we find conscience-shocking. In short, while the conduct of individuals within his department was constitutionally abhorrent, we may only hold Wyant accountable for his own conduct, not the misconduct of his subordinates. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009). For this reason, the district court erred in denying defendant Wyant's motion to dismiss.

E.

*MDHHS Executives (Lyon and Wells).*  In the complaint before us, plaintiffs' allegations against Michigan Department of Health and Human Services (MDHHS) Director Lyon and Chief Medical Executive Wells are minimal.  The complaint sets forth no facts connecting Lyon and Wells to the switch to the Flint River or the decision not to treat the water, and there is no allegation that they took any action causing plaintiffs to consume the lead-contaminated water.  Instead, plaintiffs claim generally that Lyon and Wells failed to "protect and notify the public" of the problems with Flint's water shortly before Flint switched back to DWSD.  However, the Due Process Clause is a limitation only on government action.  *See DeShaney*, 489 U.S. at 195.

We are thus left with allegations of at most questionable actions by Lyon and Wells.  The sole allegation against Lyon is that he attempted to "discredit" a study by Dr. Mona Hanna-Attisha, a pediatrician at Hurley Medical Center in Flint, showing significant increases of blood lead levels in children post-water-source switch.[8]  Paragraph 289 of plaintiffs' complaint sets forth plaintiffs' entire case against Lyon:

> MDHHS Director Nick Lyon continues trying to discredit Dr. Hanna-Attisha's study despite his own department's knowledge that it shows a real problem.  In an e-mail, he stated: "I need an analysis of the Virginia Tech/Hurley data and their conclusions.  I would like to make a strong statement with a demonstration of proof that the lead blood levels seen are not out of the ordinary and are attributable to seasonal fluctuations.  Geralyn is working on this for me but she needs someone in public health who can work directly with her on immediate concerns/questions."

And the two main factual allegations against Wells are equally sparse:

- On September 29, 2015, Wells received an email from an MDHHS employee asking, "Is it possible to get the same type of data for just children under the age of six?  So basically, the city of Flint kids ages six and under with the same type of approach as the attached chart you gave us last week?"  Another

---

[8]They also allege Lyon "participated in, directed, and/or oversaw the department's efforts to hide information to save face, and to obstruct and discredit the efforts of outside researchers.  He knew as early as 2014 of problems with lead and legionella contamination in Flint's water and instead of fulfilling his duty to protect and notify the public, he participated in hiding this information."  (Plaintiffs make the same general allegation against Wells.)  But this is precisely the type of "chimerical," "bare assertion[]" *Iqbal* requires we set aside.  556 U.S. at 681.

employee responded that "[i]t's bad enough to have a data war with outside entities, we absolutely cannot engage in competing data analyses within the Department, or, heaven forbid, in public releases." Dr. Wells replied "Agree." Plaintiffs claim this "show[ed] MDHHS continuing efforts to mislead the public, protect itself, and discredit Dr. Hanna-Attisha."

- In response to an email from Dr. Hanna-Attisha showing the tripling of blood lead levels, Wells "responded that the state was working to replicate Hanna-Attisha's analysis, and inquired about Dr. Hanna-Attisha's plans to take the information public." According to plaintiffs, this shows that "[w]hile discouraging her department to look further into Dr. Hanna-Attisha's findings and misleading Dr. Hanna-Attisha, Defendant Wells remained focused on a single task; saving face at the expense of Flint's residents."

At most, plaintiffs have alleged Lyon and Wells were unjustifiably skeptical of Dr. Hanna-Attisha's study and were hoping to assemble evidence to disprove it. This falls well-short of conscience-shocking conduct and therefore the district court erred in denying their motions to dismiss.

F.

*MDHHS Employees (Peeler and Scott).* That leaves us with two MDHHS employees, Nancy Peeler and Robert Scott, who jointly worked on projects within MDHHS designed to eliminate lead exposure. As with Lyon and Wells, the allegations against Peeler and Scott relate not to the switch of water sources, but to how they processed—or rather did not process—data relating to lead exposure more than a year later.

In general, plaintiffs allege Peeler and Scott "participated in, directed, and/or oversaw the department's efforts to hide information to save face, and actively sought to obstruct and discredit the efforts of outside researchers. Even when [their] own department had data that verified outside evidence of a lead contamination problem, [they] continued trying to generate evidence to the contrary." Scott "also served a key role in withholding and/or delaying disclosure of data that outside researchers needed to protect the people of Flint." In support of these general allegations, plaintiffs point to the following:

- Beginning in July 2015, Peeler learned there was "an uptick in children with elevated blood lead levels in Flint in July, August, and September 2014," but attributed it to "seasonal variation" instead of the water-source switch.

- On September 11, 2015, Robert Scott e-mailed a copy of a grant proposal by a Virginia Tech professor, Marc Edwards, that "described a 'perfect storm' of 'out of control' corrosion of city water pipes leading to 'severe chemical/biological health risks for Flint residents'" to Peeler and others. Scott stated, "When you have a few minutes, you might want to take a look at it. Sounds like there might be more to this than what we learned previously. Yikes!"

- Following Dr. Hanna-Attisha's study, Scott "tried to recreate [her] numbers," saw "a difference"—"but not as much difference" as found by Dr. Hanna-Attisha—in children's lead-levels pre-and post-switch, but told Peeler that he was "sure this one is not for the public."

- Scott, Peeler, and another MDHHS colleague corresponded about a Detroit Free Press story on Dr. Hanna-Attisha's study. Scott wrote, "The best I could say is something like this: 'While the trend for Michigan as a whole has shown a steady decrease in lead poisoning year by year, smaller areas such as the city of Flint have their bumps from year to year while still trending downward overall.'" Peeler chimed in that her "secret hope is that we can work in the fact that this pattern is similar to the recent past." In plaintiffs' view, this correspondence shows Peeler and Scott "intentionally withheld information that they had a duty to disclose to the public, and actively sought to hide the lead poisoning epidemic that they had previously failed to discover."

- Scott drafted an apology email to Prof. Edwards explaining why he failed to respond to multiple requests for state data. His unsent email to Edwards explained that he "worked with you earlier this month to get data to you relatively quickly but did not manage to complete the process before I went on annual leave for several days. I neglected to inform you that I'd be away, and I apologize for not informing you.'" Scott did not send the email to Edwards after Peeler told him to "apologize less," "despite," in plaintiffs' words, "the fact that Scott admitted to going on vacation and leaving an unimportant task unfinished as a public health crisis unfolded."

In total, plaintiffs' allegations against Scott and Peeler are: (1) after Dr. Hanna-Attisha released her study on September 24, 2015, Scott tried to "recreate" the study, found a smaller difference in children's lead levels than Dr. Hanna-Attisha's study, and concluded his results were "not for the public"; (2) Scott did not timely provide researchers with requested data; (3) Peeler and Scott knew that elevated lead levels could have been due to corrosion in the city water pipes; and (4) both sought to  attribute it to regular fluctuations. In our view, these allegations do not rise to the level of "callous disregard"; plaintiffs do not factually link Scott's

and Peeler's *inaction* to causing Flint residents to consume (or continue to consume) lead-tainted water.  Nor do plaintiffs identify a source of law for the proposition that an individual violates the right to bodily integrity just because he failed to "blow the whistle."  Plaintiffs have therefore not plausibly alleged Scott and Peeler engaged in conscience-shocking conduct.

In sum, the district court erred in finding that plaintiffs adequately alleged that defendants Wyant, Lyon, Wells, Peeler, and Scott violated plaintiffs' substantive due process right to bodily integrity, but correctly held plaintiffs plausibly alleged such a violation against defendants Earley, Ambrose, Croft, Busch, Shekter-Smith, Prysby, and Wurfel.

## VI.

A right is "clearly established" when its "contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Notice to officials is paramount; "the salient question" in evaluating the clearly established prong is whether officials had "fair warning" that their conduct was unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  In making this determination, "we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits."  *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006) (quotation omitted).

Plaintiffs must generally identify a case with a fact pattern similar enough to have given "fair and clear warning to officers" about what the law requires.  *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quotation omitted); *see also Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017).  But such a case need not "be on all fours in order to form the basis for the clearly established right."  *See Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013).  We do not require a prior, "precise situation," *Sutton*, 700 F.3d at 876, a finding that "the very action in question has previously been held unlawful," *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (internal quotation marks omitted), or a "case directly on point."  *al-Kidd*, 563 U.S. at 741.  Instead, the test is whether "existing precedent must have placed the . . . constitutional question beyond debate."  *Id.*  This means there must either be "controlling authority or a robust consensus of cases of persuasive authority."  *Plumhoff v. Rickard*, 134 S.

Ct. 2012, 2023 (2014) (internal quotation marks omitted).  Finally, "an action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs."  *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (citing *Hope*, 536 U.S. at 742–44).

Given the unique circumstances of this case, defendants argue we should defer to the "breathing room" qualified immunity provides and hold that the invasion of plaintiffs' right to bodily integrity via life-threatening substances with no therapeutic benefit introduced into individuals without their consent was not clearly established before the officials engaged in their respective conduct.  The dissent likewise suggests that "plaintiffs must be able to 'identify a case with a similar fact pattern' to this one 'that would have given 'fair and clear warning to officers' about what the law requires.'"  (Quoting *Arrington-Bey*, 858 F.3d at 993 (quoting *White*, 137 S. Ct. at 552)).  But the Court has "mad[e] clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope*, 536 U.S. at 741; *see also White*, 137 S. Ct. at 552 (noting that "general statements of the law are not inherently incapable of giving fair and clear warning" where the unlawfulness is apparent (citation omitted)).  For the reasons that follow, we decline to erect the suggested "absolute barrier to recovering damages against an individual government actor."  *Bletz*, 641 F.3d at 756 (citation omitted).

The lack of a comparable government-created public health disaster precedent does not grant defendants a qualified immunity shield.  Rather, it showcases the grievousness of their alleged conduct:  "The easiest cases don't even arise," *United States v. Lanier*, 520 U.S. 259, 271 (1997) (citation and internal quotation marks omitted); "there is no need that the very action in question [have] previously been held unlawful" because "[t]he unconstitutionality of outrageous conduct obviously will be unconstitutional," *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (internal quotation marks omitted); and "[s]ome personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion."  *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 499 (6th Cir. 2008).

Knowing the Flint River water was unsafe for public use, distributing it without taking steps to counter its problems, and assuring the public in the meantime that it was safe "is conduct that would alert a reasonable person to the likelihood of personal liability." *Scicluna v. Wells*, 345 F.3d 441, 446 (6th Cir. 2003). As set forth above, taking affirmative steps to systematically contaminate a community through its public water supply with deliberate indifference is a government invasion of the highest magnitude. Any reasonable official should have known that doing so constitutes conscience-shocking conduct prohibited by the substantive due process clause.[9] These "actions violate the heartland of the constitutional guarantee" to the right of bodily integrity, *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir. 1997), and "t[he] obvious cruelty inherent" in defendants' conduct should have been enough to forewarn defendants. *Hope*, 536 U.S. at 745.

Furthermore, the long line of Supreme Court cases discussed above—*Harper*, *Cruzan*, *Rochin*, *Winston*, to name a few—all build on each other from one foundation: an individual's right to bodily integrity is sacred, founded upon informed consent, and may be invaded only upon a showing of a government interest. The Court could not have been clearer in *Harper* when it stated that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." 494 U.S. at 229. Here we have an even more dramatic invasion, for at least in *Harper* the state forced medication—something needed to improve or sustain life—into its citizens; here, government officials caused Flint residents to consume a toxin with no known benefit, did so without telling them, and made affirmative representations that the water was safe to drink.

The same can be gleaned from *Cruzan*. If the common law right to informed consent is to mean anything, reasoned the Court, it must include "the right of a competent individual to refuse medical treatment." 497 U.S. at 277. If an individual has a right to refuse to ingest medication, then surely she has a right to refuse to ingest a life necessity. *Cruzan* instructs as much, recognizing that the "logic" of its bodily integrity cases—i.e., the reasoning—

---

[9]*See also Wright v. City of Phila.*, 2015 WL 894237, at *13 (E.D. Penn. March 2, 2015) ("[I]t would have been clear to a reasonable [government] employee that causing the release of airborne asbestos in Plaintiffs' home and then failing to notify Plaintiffs or acting in any way to mitigate the harm caused by the release, was unlawful under the circumstances.").

encompasses an individual's liberty interest to refuse "food and water essential to life." *Id.* at 279. And if an individual has a right to refuse the consumption of beneficial water, then certainly any reasonable official would understand that an individual has a right to refuse the consumption of water known to be lead-contaminated, especially when those individuals involved in tainting the water simultaneously vouched for its safety. Put differently, plaintiffs' bodily integrity claim implicates a clearly established right that "may be inferred from [the Supreme Court's] prior decisions." *Id.* at 278. Before *Cruzan*, a factually identical case had not been decided by the Court. Nonetheless, the Supreme Court held that the right to bodily integrity claim there was compelled by the logic and reasonable inferences of its prior decisions. *Id.* at 270, 278–79. The same is true here.

Several defendants take issue with the district court's definition of the right, contending it deals in generality instead of specificity. *See, e.g.*, *al-Kidd*, 563 U.S. at 742 (admonishing courts "not to define clearly established law at a high level of generality"). Our focus, of course, is "whether the violative nature of *particular* conduct is clearly established . . . in light of the specific context of the case." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted). To be sure, sweeping statements about constitutional rights do not provide officials with the requisite notice. "For example," the Supreme Court has told us, "the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right." *Anderson*, 483 U.S. at 639. But, the deficiencies of a too-general clearly established test have no bearing on the specifics of this case. Here, the right recognized by the district court—and one we adopt as directly flowing from the reasoning of the long line of bodily integrity and shocks-the-conscience cases—is neither a "general proposition" nor one "lurking in the broad 'history and purposes'" of the substantive due process clause. *al-Kidd*, 563 U.S. at 742. "Any other result would allow *Hope*'s fear of 'rigid, overreliance on factual similarity' in analyzing the 'clearly established' prong of

the qualified immunity standard to be realized." *Baynes*, 799 F.3d at 614 (quoting *Hope*, 536 U.S. at 742).**[10]**

In providing a tainted life-necessity and falsely assuring the public about its potability, government officials "strip[ped] the very essence of personhood" from those who consumed the water. *Doe*, 103 F.3d at 507. They also caused parents to strip their children of their own personhood. If ever there was an egregious violation of the right to bodily integrity, this is the case; the "affront to human dignity in this case is compelling," *United States v. Booker*, 728 F.3d 535, 546 (6th Cir. 2013), and defendants' "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe . . . [their conduct] is constitutionally permissible under the Due Process Clause." *Doe*, 103 F.3d at 507. We therefore agree with the district court that plaintiffs have properly pled a violation of the right to bodily integrity against Howard Croft, Darnell Earley, Gerald Ambrose, Liane Shekter-Smith, Stephen Busch, Michael Prysby, and Bradley Wurfel, and that the right was clearly established at the time of their conduct. Should discovery shed further light on the reasons behind their actions (as but one example, a governmental interest that trumps plaintiffs' right to bodily integrity), they are free to raise the qualified immunity defense again at the summary judgment stage. *See, e.g.*, *Miller v. Maddox*, 866 F.3d 386, 390 (6th Cir. 2017); *see also Wesley*, 779 F.3d at 433–34.**[11]**

---

**[10]**Some defendants and the dissent direct us to dicta in a recent District of New Jersey case involving a bodily integrity claim arising out of the discovery of leaded water in the Newark, New Jersey's public-school buildings. *See Branch v. Christie*, 2018 WL 337751 (D.N.J. Jan. 8, 2018). We are not obligated to give this decision, let alone its dicta, any persuasive value. *See Baker*, 471 F.3d at 606. The opinion is bereft of any substantive analysis regarding the right to bodily integrity, and wholly omits discussion of the Supreme Court cases mentioned in detail here. It is also factually distinct in at least one major aspect—here, the government officials participated in the decision to taint Flint's water-supply in the first instance; there, the government officials failed to take action upon discovery of the leaded water.

**[11]**We deny plaintiffs' pending motion to take judicial notice of pending but unproven criminal charges against some of the defendants and note that that the district court erred in doing so and using them to justify denying qualified immunity. First, although courts may consider judicially noticed facts when evaluating motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see, e.g.*, *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010), we have held that a "criminal indictment qualifies as a matter outside the pleading" therefore necessitating conversion to a Rule 56 motion. *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) (brackets and internal quotation marks omitted). Second, it was error for the district court to consider the charges for qualified-immunity purposes without engaging in the proper analysis. The Supreme Court has made clear that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely

VII.

The final issue is Flint's claim that the district court erred in denying it sovereign immunity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It bars suits against a state by its own citizens, and by citizens of another state. *See, e.g.*, *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Id.*

Flint, obviously, is not a state; it is a municipality incorporated under the laws of the State of Michigan. *See People v. Pickett*, 63 N.W.2d 681, 684 (Mich. 1954). The Supreme Court could not be clearer in demarcating between states and their political subdivisions for sovereign immunity purposes: "The bar of the Eleventh Amendment to suit in federal court extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (internal citations omitted); *see also Jinks v. Richland Cty.*, 538 U.S. 456, 466 (2003) ("[M]unicipalities, unlike States, do not enjoy a constitutionally protected immunity from suit."). We have even noted this contrast in one of our previous Flint Water Crisis cases, stating in dicta that the Eleventh Amendment does not apply to "the defendants associated with the City of Flint." *Boler*, 865 F.3d at 410.

Flint readily concedes municipalities do not enjoy sovereign immunity. That would normally end our analysis, but this is not a typical case. At the time of the crisis, Flint was so financially distressed that the State of Michigan had taken over its day-to-day local government operations by way of a statutory mechanism enacted to deal with municipal insolvency— gubernatorial-appointed individuals who "act for and in the place and stead of the governing

---

because their conduct violates some statutory . . . provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984). Instead, government officials are "liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages." *Id.* at 194 n.12. They do not "lose their immunity by violating the clear command of a statute . . . unless that statute . . . provides the basis for the cause of action sued upon." *Id.* Here, the district court failed to consider whether the charges could be considered under this standard.

body and the office of chief administrative officer of the local government." Mich. Comp. Laws § 141.1549(2); *see generally Phillips v. Snyder*, 836 F.3d 707, 711–12 (6th Cir. 2016) (summarizing Michigan's Local Financial Stability and Choice Act (or Public Act 436)). Flint contends it became an arm of the state because of the State of Michigan's takeover. We thus find it more appropriate to resolve whether this extraordinary factor dictates a different outcome. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.54 (1978) (suggesting that under some circumstances, local governmental units could be "considered part of the State for Eleventh Amendment purposes"). On de novo review, *see Babcock v. Michigan*, 812 F.3d 531, 533 (6th Cir. 2016), we agree with the district court that the City of Flint is not entitled to Eleventh Amendment immunity.[12]

## A.

"The entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Lowe v. Hamilton Cty. Dep't of Job & Family Servs.*, 610 F.3d 321, 324 (6th Cir. 2010) (brackets and citation omitted). We have identified four factors relevant to "whether an entity is an 'arm of the State' on the one hand or a 'political subdivision' on the other": "(1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes, and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government." *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (en banc) (internal citations omitted).

We have characterized the first factor—the state's potential liability for a judgment against the entity—as "the foremost," *id.*, the "most salient," *Town of Smyrna v. Mun. Gas Auth. of Ga.*, 723 F.3d 640, 651 (6th Cir. 2013), and one creating "a strong presumption" on the issue. *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 777 (6th Cir. 2015). Although this "state-treasury

---

[12]Flint requests that we either certify the question of whether Public Act 436 transforms municipalities into arms of the state to the Michigan Supreme Court, or delay our opinion "until after Michigan courts have had an opportunity to answer it." Certification is not appropriate here—Flint did not make the same request to the district court and we have the appropriate data points to address the issue. *See, e.g.*, *In re Amazon.com, Inc., Fulfillment Ctr. Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, 852 F.3d 601, 607–08 (6th Cir. 2017).

inquiry will generally be the most important factor, . . . it is not the sole criterion." *Ernst*, 427 F.3d at 364 (internal quotation marks omitted). This is so because sovereign immunity protects not only a state's purse but also its dignity—"it . . . serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Seminole Tribe v. Florida*, 517 U.S. 44, 58 (1996) (citation omitted). Accordingly, "the last three factors may demonstrate that an entity is an arm of the state entitled to sovereign immunity despite the fact that political subdivisions and not the State are potentially liable for judgments against the entity." *Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 762 (6th Cir. 2010). To do so, however, they must "far outweigh" the first factor. *Id.* at 761. Applying this test, we conclude the City of Flint has not met its burden to show that it was an "arm of the state" protected by the Eleventh Amendment.**[13]**

1.

Michigan's potential liability (or rather, lack thereof) weighs heavily against Flint. Michigan law provides that local property tax rolls account for judgments against cities or its officers, *see* Mich. Comp. Laws § 600.6093(1), while the state treasury pays judgments against "arms of the state." *See* Mich. Comp. Laws §§ 600.6458(2), 600.6096(1). Public Act 436 does not change this; in fact, it reinforces this dynamic, providing that any claims, demands, or lawsuits "arising from an action taken during the services of [an] emergency manager" are to "be paid out of the funds of the local government that is or was subject to the receivership administered by that emergency manager." Mich. Comp. Laws § 141.1560(5). Most critically, Public Act 436 "does not impose any liability or responsibility in law or equity upon th[e] state, any department, agency, or other entity of th[e] state, or any officer or employee of th[e] state, or

---

**[13]**Citing *Cash v. Granville County Board of Education*, 242 F.3d 219 (4th Cir. 2006), Flint quizzically argues it can separately show it is entitled to Eleventh Amendment immunity under a "sovereign dignity" inquiry independent from the traditional *Ernst* factor test set forth in text. This argument is not well-taken. For one, we are bound by our en banc decision in *Ernst*, not the Fourth Circuit's decision in *Cash*. For another, *Cash* does not hold, as Flint suggests, that "[e]ven if a defendant fails the *Ernst* test, it may still enjoy sovereign immunity if the judgment would adversely affect the dignity of the State as a sovereign." Rather, it holds consistent with our caselaw, that the "state purse" factor is foremost, but in certain situations "sovereign dignity factors"—i.e., *Ernst* factors two, three, and four—can lead to a finding of sovereign immunity. *Id.* at 224; *see also Pucci*, 628 F.3d at 761. Put differently, our *Ernst* factors already take state dignity into account when evaluating application of the Eleventh Amendment.

any member of a receivership transition advisory board, for any action taken by any local government under this act, for any violation of the provisions of this act by any local government, or for any failure to comply with the provisions of this act by any local government." Mich. Comp. Laws § 141.1572. Michigan's lack of potential liability here creates a "strong presumption" against an Eleventh Amendment finding. *See Kreipke*, 807 F.3d at 777.

2.

As to the second factor—state law treatment of, and state control over, the entity—we start with a foundational aspect of Michigan law undisputed by the parties: Municipalities enjoy significant autonomy over local governmental functions. "Michigan is strongly committed to the concept of home rule, and constitutional and statutory provisions which grant power to municipalities are to be liberally construed." *Bivens v. Grand Rapids*, 505 N.W.2d 239, 243 (Mich. 1993). Michigan's Constitution grants cities the "power to adopt resolutions and ordinances relating to its municipal concerns, property and government." Mich. Const. Art. 7, § 22 (1963). The Michigan Supreme Court has also held that home rule cities like Flint "enjoy not only those powers specifically granted, but they may also exercise all powers not expressly denied." *AFSCME v. City of Detroit*, 662 N.W.2d 695, 707 (Mich. 2003) (citation and internal quotation marks omitted). Although state statutes and Michigan's Constitution may limit these broad powers, Michigan's clear preference is that municipalities have "great[] latitude to conduct their business." *Associated Builders & Contractors v. City of Lansing*, 880 N.W.2d 765, 769 (Mich. 2016). Flint asks us to find an exception to these general principles because it was engaged in providing water services to its citizens and did so while under the control of emergency managers. We decline to do so.

First, citing *Curry v. City of Highland Park*, 219 N.W. 745 (Mich. 1928), Flint claims that when a municipality acts in the interest of public health, like providing water services, it "acts as the arm of the state" under Michigan law. *Id.* at 748. We disagree. For one, *Curry* noted that "the management of water works" is a "matter[] of purely local concern . . . as distinguished from the state at large." *Id.* (citation omitted). But more importantly and as recently illustrated by another Flint Water Crisis case, that is not what Michigan law provides.

*See Boler v. Governor*, --- N.W.2d ---, 2018 WL 2991257 (Mich. Ct. App. 2018) (per curiam).[14] The import of Michigan's Constitution and its Home Rule City Act, Mich. Comp. Laws § 117.1, *et seq.*, is that "if a municipality is supplying a utility, or specifically waterworks, to its citizens and the citizens are paying for the same, the municipality is operating the waterworks as a business and it is doing so as a businessman or corporation, not as a concern of the state government or arm of the state. It is, after all, serving only a limited number of people within its boundaries, not the state as a whole." *Id.* at *4. Michigan's Home Rule City Act expressly empowers a municipality to "provide for the installation and connection of sewers and waterworks in its charter." *Id.* (citing Mich. Comp. Laws § 117.4b); *see also* Mich. Comp. Laws §§ 117.4c(1), 117.4f. But if, for example, a municipality supplies water for another purpose— "protecting its citizens from fire or natural disaster or anything else that has the potential to have state-wide impact, and it is not profiting from the provision of that water"—then and only then could a municipality's waterworks "perhaps" serve the state's citizenry at large and thus be deemed an arm of the state. *Boler*, --- N.W.2d ---, 2018 WL 2991257, at *4. And as the Michigan Court of Appeals determined, Flint's provision of water services clearly falls within its "proprietor" function and does not transform the city into an arm of the state. *Id.*; *see also Collins v. City of Flint*, 2016 WL 8739164, at *4 (Mich. Ct. Cl. Aug. 25, 2016).

Second, we are equally unconvinced that Flint's emergency-management status should weigh in Flint's favor. At first blush, Flint's argument here has some facial appeal—generally speaking, Public Act 436 can be a one-way ticket to state receivership. The governor, in consultation with several bodies, determines whether a financial emergency exists, and then provides the entity at issue with four options (one of which is emergency management). *See Phillips*, 836 F.3d at 712. Flint claims these options are illusory because state officials still have significant oversight within each option, and were nonetheless unavailable to Flint because

---

[14]Michigan's Court of Claims Act grants the Michigan Court of Claims exclusive jurisdiction "[t]o hear and determine any claim or demand, statutory or constitutional . . . against the state or any of its departments or officers." Mich. Comp. Laws § 600.6419(1)(a). The issue presented in *Boler v. Governor* was whether claims arising out of the Flint Water Crisis against Flint were within the exclusive jurisdiction of the Court of Claims. Although it is strictly a statutory interpretation case, we find its analysis persuasive for it provides extensive discussion about the relationship between Michigan and its political subdivisions.

Public Act 436 kept in place Flint's prior-appointed emergency manager under a prior version of the emergency manager law. *See id.* at 711–12; *see also* Mich. Comp. Laws § 141.1549(10).

Once in receivership, the argument goes, Flint was essentially at the whim of its emergency managers. One need not look beyond Public Act 436's power-authorizing provision to appreciate its breadth:

> Upon appointment, an emergency manager *shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government.* The emergency manager *shall have broad powers in receivership* to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Following appointment of an emergency manager and during the pendency of receivership, *the governing body and the chief administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager* or as otherwise provided by this act and are subject to any conditions required by the emergency manager.

Mich. Comp. Laws § 141.1549(2) (emphasis added). In essence, an emergency manager acts "for and on behalf of the local government," and may take any "action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government." § 141.1552(dd)–(ee).

There is also a certain amount of control the state has over the emergency manager. Among other things, an emergency manager "is a creature of the Legislature with only the power and authority granted by statute"; is appointed by the governor; serves at the governor's pleasure, and may be removed by the governor or by impeachment by the Legislature; receives financial compensation from the state treasury; is subjected "to various codes of conduct otherwise applicable only to public servants, public officers and state officers"; and is statutorily obligated to submit certain plans and reports to state officials. *See Mays*, 916 N.W.2d at 256 (citations omitted). On this basis, the Michigan Court of Appeals has held (again, in a Flint Water Crisis matter) that an emergency manager is a "state officer" for purposes of the Court of Claims Act

and thus "[c]laims against an emergency manager acting in his or her official capacity therefore fall within the well-delineated subject-matter jurisdiction of the Court of Claims." *Id.* at 257.

The problem with Flint's argument is that Michigan courts have rejected the notion that a city's emergency management status transforms a city into a state entity. In the words of the Michigan Court of Appeals:

> As indicated in the Local Financial Stability and Choice Act, "it is a valid public purpose for this state to take action and to assist a local government in a financial emergency so as to remedy the financial emergency." The primary purpose of the Act, then, was for the State of Michigan to *assist* local governments temporarily during a financial crisis. The emergency manager acts in the place of the chief administrative officer and governing body for and on behalf of the local government only. At all times, then, the City remained a municipality, albeit with a state employee temporarily overseeing the financial management of the municipality affairs. The City was at no time operating as "a means or agency through which a function of another entity i.e., the state is accomplished." No function or purpose of the state was accomplished in the emergency manager overseeing the City. The City was instead always operating as a means through which functions of its own entity were accomplished. The state simply engaged a state employee to temporarily assist the City in performing its functions and serving its local purposes for its citizens.

*Boler v. Governor*, --- N.W.2d ---, 2018 WL 2991257, at *6 (alterations and citations omitted); *see also Collins*, 2016 WL 8739164, at *4–5. We agree with this well-reasoned analysis. Moreover, it is consistent with our recent decision in *Phillips*, where we noted Public Act 436 merely reflects states' abilities "to structure their political subdivisions in innovative ways," including by "allocat[ing] the powers of subsidiary bodies among elected and non-elected leaders and policymakers." 836 F.3d at 715. That is, Public Act "436 does not remove local elected officials; it simply vests the powers of the local government in an emergency manager." *Id.* at 718.

Given this, we conclude the second factor tilts against Flint.

3.

The appointment factor weighs in Flint's favor. Public Act 436 expressly provides that the governor appoints an emergency manager. Mich. Comp. Laws § 141.1549(1). The state

attempts to temper this specific appointment language by pointing out that emergency management under Public Act 436 is one of last resort—that upon declaration of financial emergency, a municipality has several options in addition to emergency management, *see* § 141.1547, and may remove an emergency manager after 18 months (or petition the governor to remove the emergency manager earlier). § 1549(6)(c), (11). That may be so, but *Ernst* is specific here—we are to consider *who* appoints the entity at issue, and there is no debating that although a municipality might have some ability to avoid emergency management or to remove an emergency manager, Michigan's governor appoints emergency managers.

4.

Whether the entity's functions fall within the traditional purview of state or local government weighs heavily against Flint. Under Public Act 436, an emergency manager takes the place of a local body; he, in other words, takes over the local government's functions. And as the State of Michigan rightly phrases it, "[t]he City of Flint's functions *are* 'within the traditional purview of local government' because the City of Flint *is* a local government."

Flint has no answer for this obvious point, and instead asks us to narrowly focus on the City's provision of waterworks. It underwhelmingly strings this argument together: Because Michigan's Safe Drinking Water Act provides the MDEQ with "power and control over public water supplies and suppliers of water" and criminalizes the failure to comply with MDEQ rules, *see* Mich. Comp. Laws §§ 325.1003, 325.1021, "the functioning of a waterworks falls within the purview of the State." But even were we to ignore the fact that Public Act 436's command to an emergency manager is to take over *all* of a municipality's functions and not just its utilities, the answer is still the same given our discussion above. Flint even admits as much, telling us "the day-to-day operations of a waterworks generally fall within the purview of local authorities." That MDEQ "exercises the state's police powers, in an oversight capacity, by regulating the water quality" does not dictate a contrary conclusion, for "MDEQ does not own, operate or maintain the water delivery systems, . . . [n]or is it charged with providing water to the inhabitants of Michigan's cities." *Collins*, 2016 WL 8739164, at *4. Thus, we decline to effectively turn every local governmental body's provision of service into an arm of the state

when that service is regulated by the state in some fashion. *Cf. N. Ins. Co. of New York v. Chatham Cty.*, 547 U.S. 189, 194 (2006) (merely "exercis[ing] a slice of state power" does not transform a state's subdivision into an arm of the state (internal quotation marks omitted)).

B.

In sum, Flint has not met its burden to show that when under emergency management, it was an "arm of the state" protected by the Eleventh Amendment. The foremost consideration—the state's potential liability for judgment—counsels against a finding of Eleventh Amendment immunity, and the remaining factors do not "far outweigh" this factor. *Pucci*, 628 F.3d at 761.

VIII.

For these reasons, we affirm the district court in part, and reverse in part.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

McKEAGUE, Circuit Judge, concurring in part and dissenting in part. The majority tells a story of intentional poisoning based on a grossly exaggerated version of plaintiffs' allegations. The complaint tells an entirely different story. It is a story of a series of discrete and discretionary decisions made by a variety of policy and regulatory officials who were acting on the best information available to them at the time. In retrospect, that information turned out to be grievously wrong. The result is what has become known as the Flint Water Crisis. The question this case presents is not whether the collective result of the officials' actions—the Water Crisis— caused any harm. It did. The question is, rather, whether any official's discrete decisions or statements, which in any way caused or contributed to the Crisis, violated a substantive due process right to bodily integrity. By answering that question with, "obviously, yes," the majority extends the protections of substantive due process into new and uncharted territory and holds government officials liable for conduct they could not possibly have known was prohibited by the Constitution. In doing so, the majority unfairly denies defendants protection from suit under the doctrine of qualified immunity.

As in all cases dealing with the defense of qualified immunity, it is plaintiffs' burden to establish, first, that the defendants violated a constitutional right and, second, that the right was clearly established at the time the challenged conduct took place. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). I have serious doubts about whether plaintiffs carried their burden at the first prong of the analysis. I am certain they failed to carry their burden at the second. The majority reaches the opposite conclusion by building on a factual narrative of its own invention.

To place the qualified-immunity analysis on firmer footing, I begin with a recitation of the allegations as told by plaintiffs in their complaint. I then turn to qualified immunity's two prongs. As to the first, I doubt that plaintiffs allege that any defendant deprived them of a Fourteenth Amendment substantive-due-process right—both because the conduct actually alleged in the complaint does not appear to be conscience-shocking and because the Due Process

Clause has never before been recognized as protecting against government conduct that in some way results in others being exposed to contaminated water. But even if plaintiffs have alleged the violation of a recognized due process right, their claim nonetheless fails at prong two of the qualified-immunity analysis, which asks whether the right was clearly established. The mere fact that no court of controlling authority has ever recognized the type of due process right that plaintiffs allege in this case is all we need to conclude the right is not clearly established. Accordingly, qualified immunity must shield each defendant from suit.

Before moving to the analysis, I note several points of agreement with the majority opinion. First, I join the majority in rejecting the City of Flint's argument that it is entitled to Eleventh Amendment immunity from plaintiffs' suit because the State of Michigan's takeover of the City of Flint, pursuant to Michigan's "Emergency Manager" law, transformed the City into an arm of the state. Additionally, I agree that plaintiffs fail to state a Fourteenth Amendment claim against Michigan Department of Health and Human Services (MDHHS) employees Nick Lyon, Eden Wells, Nancy Peeler, and Robert Scott; and Michigan Department of Environmental Quality (MDEQ) director Daniel Wyant. That is where my agreement ends, however. I respectfully dissent from the denial of qualified immunity for Flint Emergency Managers Darnell Earley and Gerald Ambrose; Flint's Director of Public Works Howard Croft; and MDEQ employees Liane Shekter-Smith, Stephen Busch, Michael Prysby, and Bradley Wurfel.

## I

I begin with a review of the facts. Because this case comes before us on appeal from a motion to dismiss for failure to state a claim, I accept all factual allegations as true and construe them in the light most favorable to plaintiffs. *Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 637 (6th Cir. 2017).

The Flint Water Crisis began when the City of Flint, undergoing extreme financial distress, came under the leadership of a succession of "Emergency Managers"—temporary city managers appointed by the governor to "act for and in the place and stead of the governing body and the office of chief administrative officer of the local government." M.C.L. § 141.1549(2). One of the City's Emergency Managers was Edward Kurtz. In 2013, Kurtz made a critical fiscal

decision that set the City on a path toward the Flint Water Crisis. With the approval of the State of Michigan's treasurer, Kurtz terminated a decades-long contract for water services from the Detroit Water and Sewerage Department (DWSD) and ordered Flint to join the newly-formed and more affordable Karegnondi Water Authority (KWA). The KWA was not yet functional, however. So Kurtz had to choose an interim source of Flint's drinking water. He determined that the best temporary source, from a budgetary standpoint, was the Flint River, treated at the City's own, and then-idle, water treatment plant. He notified the DWSD that Flint would soon cease receiving water from the DWSD.

Before the switch was finalized, Darnell Earley took over as Emergency Manager, assuming the position in November 2013. The City officially switched to the Flint River in April 2014. For decades prior, the Flint water treatment plant was designated for emergency use only. A 2011 "feasibility report" concluded that it would take extensive upgrades to bring it in compliance with "applicable standards" for use as a permanent water source. Plaintiffs allege that Earley "rushed" the switch to meet a "self-imposed" and "aggressive" deadline, without ensuring that Flint's water treatment plant was ready to properly treat Flint River water, and that he did so for the purpose of cutting costs. But they also assert that, at some point before the April 2014 switch, Flint hired an engineering firm—Lockwood, Andrews, & Newman (Lockwood)—"to prepare Flint's water treatment plant for the treatment of new water sources, including both the KWA and the Flint River." Even though the Flint River water was highly corrosive, plaintiffs allege that Lockwood did not advise the City to set water quality standards or implement corrosion control at the water treatment plant prior to using the River as a drinking water source.

Neither did the MDEQ—the state agency primarily responsible for ensuring compliance with federal and state safe drinking water laws. Relevant here, the MDEQ was tasked with ensuring Flint complied with the federal Lead and Copper Rule. That Rule generally requires public water systems to monitor and treat lead and copper levels in drinking water. 40 C.F.R § 141.80, *et seq.* The MDEQ believed, erroneously as it turns out, that the Rule allowed Flint's water treatment plant to begin distributing Flint River water and then conduct two rounds of six-month testing before determining what method of corrosion control to use to treat the water. So

in April 2014, the City began distributing the Flint River water to residents without first implementing corrosion control treatment. Around the time of the switch, the director of Flint's Department of Public Works, Howard Croft, publicly announced that the City's testing proved the water was safe and "of the high quality that Flint customers have come to expect."

Soon after the transition, however, problems emerged. Residents complained of oddly smelling and discolored water. In October 2014, General Motors stopped using the City water at its engine-manufacturing plant out of fear that high levels of chloride would cause corrosion. Then, after the City attempted to disinfect the water, it discovered trihalomethanes—a potentially toxic byproduct caused by attempting to disinfect the water. That discovery prompted the City to mail a notice to its customers explaining that the City was in violation of the Safe Drinking Water Act but that the water was safe to drink for most people with healthy immune systems. Additionally, plaintiffs say that "[a]s early as January of 2015, the State of Michigan provided purified water coolers at its Flint offices in response to concerns about the drinking water."

On January 9, 2015, the first apparent concerns of lead in Flint's drinking water began to emerge. On that day, The University of Michigan-Flint discovered lead in campus drinking fountains. It is unclear from the complaint whether that discovery was publicized and thus whether any City or State official involved in testing or distributing Flint's water knew about the discovery.

Also around January 2015, and largely in response to citizen complaints, Flint hired another engineering firm—Veolia North America, LLC (Veolia)—to review the City's water quality. Veolia completed a "160-hour assessment of the treatment plant, distribution system, customer services and communication programs, and capital plans and annual budget." The firm issued a final report in March, in which it concluded that Flint was in "compliance with State and Federal water quality regulations, and based on those standards, the water [was] considered to meet drinking water requirements." Additionally, it stated that discolorations in the water "raise[d] questions" but that the water remained safe to drink.

Around that time, another Emergency Manger, Gerald Ambrose, took over the City's operations. On January 12, 2015, the day before Ambrose assumed his Emergency Manager role, the DWSD offered to waive a 4-million-dollar reconnection fee if the City of Flint resumed using its services. Ambrose declined the offer. Then, in late March, Flint's City Council voted 7-1 to resume services with the DWSD. Ambrose rejected the vote, calling it "incomprehensible."

In the meantime, several MDEQ employees were having internal discussions about Flint's water problems. Liane Shekter-Smith, MDEQ's Chief of the Office of Drinking Water and Municipal Assistance, emailed other MDEQ employees to suggest that the Flint River water was "slough[ing] material off of pipes" in the distribution system rather than "depositing material or coating pipes[.]" She opined that "[t]his may continue for a while until things stabilize."

Soon, an EPA employee became involved in the discussion as well. Miguel Del Toral, the EPA's regional drinking water regulations manager, reached out to the MDEQ on February 27, 2015, to voice his concerns about the possibility of elevated lead levels. Del Toral informed Michael Prysby, an MDEQ engineer, that the MDEQ's specific method for testing lead levels in Flint residents' tap water may be producing test results that underestimated lead levels. He also asked whether the water treatment plant was using optimized corrosion control, which he noted was "required" to be in place. That same day, Stephen Busch, an MDEQ District Supervisor in Lansing, responded to Del Toral stating that the water treatment plant had an "optimized corrosion control program." Two months later, an unidentified individual from the MDEQ informed the EPA that it had no optimized corrosion control treatment in place.

In April 2015, Del Toral again reached out to the MDEQ, this time issuing a memorandum that expressed concern with the lack of corrosion control and Flint's water testing methods. He also told MDEQ employees Busch and Prysby that he believed the MDEQ's sampling procedures did not properly account for the presence of lead service lines. Therefore, Del Toral said he "worried that the whole town may have much higher lead levels than the

compliance results indicated[.]"   According to plaintiffs, the MDEQ "ignored and dismissed" Del Toral's concerns.

A few months later, plaintiffs say that Busch "claimed that 'almost all' homes in the pool sampled for lead in Flint had lead services lines," even though this was untrue.  Plaintiffs do not indicate to whom Busch made that statement.  Later in July, a reporter broke a story announcing that Flint's water was contaminated with lead, citing Del Toral's April 2015 memorandum.  In response, Bradley Wurfel, MDEQ's Communications Director, publicly stated that "anyone who is concerned about lead in the drinking water in Flint can relax."

That same month, the EPA and the MDEQ had a conference call to discuss MDEQ's compliance with the Lead and Copper Rule.  According to plaintiffs, the EPA pushed for Flint to use optimized corrosion control, but the MDEQ insisted that doing so was "unnecessary and premature."  In a follow-up email, MDEQ employee Shekter-Smith asked the EPA to provide a written concurrence that the City was in compliance with the Lead and Copper Rule.

Also in July, MDEQ employees exchanged a series of internal emails discussing how water tests performed by outside sources, which showed that Flint's drinking water had impermissibly high lead levels, compared with the MDEQ's own water testing results, which showed lower lead levels.  When a report by a Virginia Tech professor revealing high lead levels surfaced in September 2015, Wurfel made public statements challenging the report and asserting that Flint's drinking water remained in compliance with federal and state laws.  During this time, other MDEQ employees maintained that Flint was not required to use corrosion control until unacceptably high levels of lead had already appeared in the water, which they believed was not yet the case.

Later in September, Croft emailed "numerous officials" to report that the City of Flint had "officially returned to compliance with the Michigan Safe Drinking Water Act" and that it had "received confirming documentation from the [M]DEQ" to that effect.  He explained that "[a]t the onset of our plant design, optimization for lead was addressed and discussed with the engineering firm and with the [M]DEQ.  It was determined that having more data was advisable prior to the commitment of a specific optimization method. . . . We have performed over one

hundred and sixty lead tests throughout the city since switching over to the Flint River and remain within EPA standards."[1]

The MDHHS also began to take a closer look at the outside studies showing high lead levels in Flint's water. Though at least a few MDHHS employees became aware of an increase in blood lead levels in Flint's children in July, the increase was attributed to "seasonal variation"—a summer phenomenon in which children's blood lead levels naturally increase because of more frequent exposure to lead in soil and other seasonal factors. But in September, MDHHS employees began to take a closer look. They circulated a study conducted by a pediatrician at a Flint hospital, Dr. Mona Hanna-Attisha, which showed elevated blood lead levels in children. The next day, one MDHHS employee attempted to recreate the study but came up with different numbers. The City of Flint also issued a health advisory telling residents to flush pipes and install filters to prevent lead poisoning. On October 1, 2015, the MDHHS officially confirmed Dr. Hanna-Attisha's results.

Finally, on October 16, 2015, Flint reconnected to the DWSD. Two days later, MDEQ Director Daniel Wyant admitted to Michigan's governor that MDEQ "staff made a mistake while working with the City of Flint. Simply stated, staff employed a federal (corrosion control) treatment protocol they believed was appropriate, and it was not." Several MDEQ employees subsequently resigned or were suspended without pay. On January 21, 2016, the EPA issued an Emergency Order identifying the primary cause of increased lead levels in Flint's water as being a lack of corrosion control treatment after the City's switch to the Flint River.

## II

To make it past qualified immunity's first prong, a plaintiff must plead facts showing that a government official violated a constitutional right. *al-Kidd*, 563 U.S. at 735. Plaintiffs assert that their claim falls under the fundamental right to bodily integrity, a right guaranteed by the substantive component of the Fourteenth Amendment's Due Process Clause. *Albright v. Oliver*,

---

[1]It is unclear whether the "one hundred and sixty lead tests" were part of the "160-hour assessment" that Veolia conducted in early 2015 as part of its review of the City's water treatment plant.

510 U.S. 266, 272 (1994).  We measure whether the deprivation of a right to bodily integrity—or any other substantive-due-process right—actually occurred by determining whether a defendant's alleged conduct was so heinous and arbitrary that it can fairly be said to "shock the conscience." *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996).  At times we have treated these two elements (deprivation of a constitutional right and conscience-shocking behavior) as separate methods of stating a substantive-due-process claim.  *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014).  At other times we have concluded they are both required. *See Am. Express Travel Related Servs. Co., Inc. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011). But whether these are two separate methods of establishing a substantive-due-process violation or are two required elements of doing so does not change the outcome in this case.  Plaintiffs' allegations show neither conscience-shocking conduct nor the violation of a fundamental right.

To demonstrate why, I turn back to the allegations in plaintiffs' complaint.  The complaint is particularly important here, because substantive due process is an undefined area where "guideposts for responsible decisionmaking . . . are scarce and open-ended" and "judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  We must, therefore, "focus on the allegations in the complaint to determine how [plaintiffs'] describe[] the constitutional right at stake and what [defendants] allegedly did to deprive [plaintiffs] of that right." *Id.*  The majority pays lip service to that command but abandons it in the analysis. Although the majority describes the bodily integrity right at stake as the right to be free from a government official "knowingly and intentionally introducing life-threatening substances into individuals without their consent," the right plaintiffs allege was violated is altogether different.

Plaintiffs' complaint specifically states: "In providing Plaintiffs with contaminated water, and/or causing Plaintiffs to consume that water, Defendants violated Plaintiffs' right to bodily integrity, insofar as Defendants failed to protect Plaintiffs from a foreseeable risk of harm from the exposure to lead contaminated water."  That claim makes clear where defendants allegedly went wrong.  It was not in knowingly introducing life-threatening substances into plaintiffs' bodies against their will; it was in allegedly "*fail[ing] to protect* plaintiffs from a foreseeable risk of harm from the *exposure to lead contaminated water*"  (emphasis added).

And that claim, as framed by plaintiffs, immediately encounters two roadblocks to establishing a due process violation: (1) a policymaker's or regulator's unwise decisions and statements or failures to protect the public are typically not considered conscience-shocking conduct, and (2) the Due Process Clause does not generally guarantee a bodily integrity right against exposure to contaminated water or other types of environmental harms.  These two roadblocks raise serious doubts about whether plaintiffs meet the first prong of the qualified immunity analysis.  I review each of these problems with plaintiffs' claim in turn, starting first with whether defendants' alleged conduct rises to the conscience-shocking level.

## A

The first roadblock to plaintiffs' due process claim is that the conduct alleged fails to meet the "high" conscience-shocking standard.  *Range*, 763 F.3d at 589.  Plaintiffs' "failure to protect from foreseeable harm" theory sounds in classic negligence.  But negligence—even gross negligence—does not implicate the Due Process Clause's protections.  *Daniels v. Williams*, 474 U.S. 327, 331–33 (1986).  "The Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society[.]'"  *Collins*, 503 U.S. at 128 (citation omitted).  Rather, it serves to limit the government from using its power as an "instrument of oppression."  *DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 195 (1989) (citation omitted).  Accordingly, substantive due process is implicated only by government actions (and sometimes failures to act) that are "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that [they] amount[] to a brutal and inhumane abuse of official power literally shocking to the conscience."  *Lillard*, 76 F.3d at 725 (citation omitted).  Normally, meeting that standard requires plaintiffs to show an intent to injure through some affirmative act, but, depending on the context, even a deliberately indifferent failure to act may constitute conscience-shocking behavior.  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  In the context of a non-custodial case such as this one, to show conscience-shocking behavior based on deliberate indifference, a plaintiff must show something akin to "callous disregard or intent to injure.  *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005) (citing *Lewis*, 523 U.S. at 846); *see also Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 538 (6th Cir. 2008) ("[I]n order to succeed on a

§ 1983 claim in a non-custodial setting, a plaintiff must prove either intentional injury or 'arbitrary conduct intentionally designed to punish someone[.]'" (citation and emphasis omitted)).

In all cases, we are required to perform an "exact analysis of the circumstances before" condemning "any abuse of power . . . as conscience shocking." *Lewis*, 523 U.S. 850. The majority eschews that requirement. Instead of reviewing the defendant-specific allegations in context, it cherry-picks a few "examples" from plaintiffs' complaint and strings them together to form a narrative not told by plaintiffs. In compounding that error, the majority draws inconsistent, even contradictory, conclusions about the level of culpability the allegations entail. In one breath, the majority says plaintiffs plausibly allege that defendants "knowingly and intentionally introduc[ed] life-threatening substances into individuals without their consent." But in another breath, it says "[t]here is no allegation defendants intended to harm Flint residents." In yet another, the majority says defendants "systematically contaminate[d]" the Flint community. I will leave it to the reader to reconcile how conduct may constitute a knowing, intentional, and systematic attempt to contaminate another without also being motivated by an intent to harm that person. I, for one, fail to follow that logic. It is only by this imprecise analysis that the majority concludes these defendants acted in a conscience-shocking manner.

A more exact, defendant-specific analysis shows otherwise. The following analysis reveals that plaintiffs do not allege the additional "callous disregard or intent to injure" element that applies to non-custodial deliberate-indifference claims. I review the allegations against Flint's Emergency Managers (Darnell Earley and Gerald Ambrose),[2] Flint's Department of Public Works Director (Howard Croft), and the MDEQ employees (Liane Shekter-Smith, Stephen Busch, Michael Prysby, and Bradley Wurfel) in turn. Additionally, I explain why I agree with the majority that the case against the MDHHS executives and employees (Nick Lyon, Eden Wells, Nancy Peeler, and Robert Scott) and the MDEQ Director (Daniel Wyant) must be dismissed.

---

[2]Plaintiffs also bring a claim against the City of Flint, which necessarily rises and falls with their claim against the Emergency Managers. Because the Emergency Managers were acting on behalf of the City, their policy decisions concerning the source of the City's water were also policy decisions of the City. Accordingly, plaintiffs' claim implicates the City only to the extent the Emergency Managers' decisions were unconstitutional.

**1**

*Flint Emergency Managers Darnell Earley and Gerald Ambrose.* First, consider plaintiffs' allegations against Emergency Managers Earley and Ambrose. According to plaintiffs, Earley "rushed" the switch to the Flint River to meet a "self-imposed" and "aggressive" deadline as a cost-saving measure without ensuring the water treatment plant was adequately equipped to treat the water. Ambrose later rejected opportunities to return to the DWSD despite residents' complaints and other evidence pointing to the water's high corrosivity. The majority concludes that both Emergency Managers approved the initial and ongoing use of the Flint River as a water source despite knowing the City's water treatment plant was not equipped to treat the water. Not so.

Consider the Emergency Managers' decisions in context, starting with the initial switch under Earley's leadership. Recall that before the switch, the City consulted with the Lockwood engineering firm to ready its treatment plant. The engineering firm did not advise the City to implement corrosion control. Neither did the MDEQ. In fact, the MDEQ informed the City that it was "satisfied with the water treatment plant's ability to treat water from the Flint River." And although the MDEQ noted that the KWA was "a higher quality source [of] water" than the Flint River, it never indicated that use of the Flint River would place residents at risk of lead contamination. Fast-forward to early 2015, when Ambrose rejected two opportunities to reconnect to the DWSD. At that time, the City had hired the Veolia engineering firm to review its water quality and treatment procedures. After a 160-hour assessment, Veolia concluded that Flint's water complied with applicable laws and did not advise Flint to use corrosion control.

The Emergency Managers' reliance on expert advice does not demonstrate a callous disregard for or intent to injure plaintiffs. Earley and Ambrose were budget specialists, not water treatment experts. They did not oversee the day-to-day operations of the water treatment plant, nor did they carry any responsibility for ensuring its compliance with federal or state laws. Accordingly, their reliance on the industry and regulatory experts who were tasked with preparing the water treatment and ensuring its compliance with safe drinking water laws does not demonstrate conscience-shocking behavior.

The majority, with the luxury of hindsight, believes that whether Earley or Ambrose reasonably relied on the opinions of the MDEQ or professional engineering firms is better left for summary judgment. But that belief suggests that the Due Process Clause may obligate managers of a municipal budget or other government officials to reject the advice of industry and regulatory experts based on the risk that those experts are wrong. Such a conclusion cuts against the "presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." *Collins*, 503 U.S. at 128. Indeed, "[i]t is in the very nature of deliberative bodies to choose between and among competing policy options, and yet a substantive due process violation does not arise whenever the government's choice prompts a known risk to come to pass." *Schroder*, 412 F.3d at 729. Yet under the majority's conscience-shocking analysis, a whole host of policy decisions would now be subject to constitutional review, in direct contravention of the presumption of rational regulatory decisionmaking. *See, e.g.*, *White v. Lemacks*, 183 F.3d 1253, 1258 (11th Cir. 1999) ("[W]hen governmental action or inaction reflects policy decisions about resource allocation (as is often the case), those decisions are better made 'by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.'" (quoting *Collins*, 503 U.S. at 129)).

Finally, the majority asserts that concluding that Ambrose and Earley were relying on experts places an inappropriately "benign construction on the factual allegations." Yet the majority cites no factual allegations supporting any other conclusion. Instead, it accepts plaintiffs' various "labels and conclusions"—for instance, that Ambrose and Earley "knew" about risks to Flint residents—as sufficient support for their claim. This cuts against the Supreme Court's directive that plaintiffs allege facts, not conclusions, to state entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The bottom line is that plaintiffs do not allege that any industry or regulatory expert informed Earley or Ambrose that the City's water treatment plant was not equipped to treat Flint River water or that the water was not being treated with corrosion control. In fact, plaintiffs allege just the opposite. Professional engineering firms and the MDEQ repeatedly affirmed that Flint's drinking water complied with applicable law. Accordingly, the Emergency Managers' approval of the plant's initial and

ongoing use of the Flint River as a water source does not plausibly demonstrate callous disregard for or an intent to injure plaintiffs, let alone any effort to "systematically contaminate" the Flint community.

**2**

*MDEQ employees Liane Shekter-Smith, Stephen Busch, Michael Prysby, and Bradley Wurfel.* Next consider the claims against the various MDEQ employees. Plaintiffs contend that every MDEQ employee misinterpreted the Lead and Copper Rule. Under the MDEQ's erroneous interpretation of the Rule, the City could begin distributing Flint River water to residents and then conduct two six-month rounds of lead testing before treating the water with corrosion control. Without immediate treatment, the water accumulated lead as it flowed through the City's pipes. And over time, plaintiffs' drinking water became contaminated with allegedly unhealthy levels of lead. Plaintiffs equate the MDEQ's misinterpretation of the Lead and Copper Rule's corrosion-control requirements with conscience-shocking behavior that caused plaintiffs' exposure to lead.

As gravely erroneous as the MDEQ's interpretation of the Rule appears in hindsight, however, there is no legal support for the conclusion that it amounted to conscience-shocking conduct. On the contrary, a mistake of law is the classic type of conduct that qualified immunity protects from suit. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" (citation omitted)); *Gavitt v. Born*, 835 F.3d 623, 640–41 (6th Cir. 2016). That should end the case against these defendants.

The majority concludes, however, that the MDEQ's misinterpretation may have been intentional. According to the majority, plaintiffs' allegations present the "bleak[]" possibility that the MDEQ may have used Flint residents as "guinea pigs" to test lead-compliance theories unsupported by the law. None of plaintiffs' factual allegations make that inference a reasonable one. This is not a conspiracy case. Plaintiffs do not assert that the MDEQ employees maliciously *agreed* to a certain incorrect interpretation of the Lead and Copper Rule to exempt

Flint from using corrosion control. And it is implausible that each MDEQ employee *individually* set out to advance the same incorrect interpretation of the Rule just to save the City money. Indeed, plaintiffs do not allege that any MDEQ employee intentionally misled Flint about the Rule's requirements. Instead, plaintiffs' allege that the MDEQ provided misguided advice rooted in mistaken interpretations of law—the type of conduct that, though it led to extremely unfortunate consequences here, is classically entitled to protection from suit under the doctrine of qualified immunity.

Still, the majority takes plaintiffs' allegations a step further, making the sweeping assertion that the MDEQ employees "created" the Flint Water Crisis by knowingly approving distribution of Flint River water with the use of an ill-prepared water treatment plant and then deceiving the public about the consequences of that decision. The allegations do not support that theory, however.

First, plaintiffs do not allege facts showing that Shekter-Smith, Busch, Prysby, or Wurfel personally approved the City's use of the Flint River and the Flint water treatment plant. Rather, plaintiffs say that the decision was made by Kurtz, Flint's 2013 Emergency Manager, with approval from the State's treasurer. Moreover, plaintiffs fail to allege that any of these MDEQ employees knew that the Flint water treatment plant was incapable of treating Flint River water. To be sure, plaintiffs allege that "all Defendants" were aware of a 2011 "feasibility report" rejecting the use of the Flint River at the time because of costs associated with bringing the treatment plant in compliance with "applicable standards." But plaintiffs provide no further context surrounding the report's creation and who knew about its contents. On the other hand, plaintiffs allege that, prior to the switch, Flint's Utilities Administrator told Prysby and Busch that the water treatment plant had "developed a system of redundant electrical systems, treatment processes and adequate finished water storage" after consulting with the MDEQ and an engineering firm. And after that, Busch informed Wurfel that the MDEQ was "satisfied with the City's ability to treat water from the Flint River[.]" These allegations thus do not suggest that any MDEQ employee knew the treatment plant was actually incapable of properly treating Flint River water and approved its use anyway.

Nor do the majority's "poignant examples" of a handful of plaintiffs' allegations show an attempt by any MDEQ employee to knowingly mislead the public about Flint's alleged noncompliance with drinking water laws or to falsely assure residents of the water's safety.

*Prysby.* Take Prysby, an MDEQ engineer, first. The majority latches on to a single email sent from Prysby to a couple other MDEQ employees in October 2014. In it, Prysby opines that the fact that a General Motors engine-manufacturing plant stopped using Flint River water because of its corrosive nature did not mean that the water should be labeled "'corrosive' from a public health standpoint." According to the majority, that statement shows that Prysby was more interested in spinning the water's corrosive nature as unconnected to public health instead of investigating problems with the water. But a "[n]egligent failure to investigate . . . does not violate due process." *Wilson v. Lawrence Cty.*, 260 F.3d 946, 955 (8th Cir. 2001) (citations omitted). And no other allegation against Prysby demonstrates anything more than a failure to act—plaintiffs' remaining allegations name Prysby as merely a recipient of various emails but they do not identify any specific actions taken by him. Plaintiffs thus do not plausibly allege that Prysby created the Flint Water Crisis and then deceived the public about it.

*Busch.* Nor do the allegations support such a finding when it comes to Busch. The complaint references a number of Busch-authored emails, but the majority references only two internal emails exchanged between MDEQ employees and between Busch and EPA employee Del Toral. The majority concludes that Busch lied in the latter email, when he informed Del Toral in February 2015 that Flint's water treatment plant "had an optimized corrosion control program" in place, which demonstrates conscience-shocking behavior. But the complaint contains no factual allegations supporting the conclusion that Busch's statement was a lie. Flint *did* have a corrosion control "program" in place—a program that permitted a two-round testing period after the plant became operational and before plant administrators chose a particular method of corrosion control *treatment*. The MDEQ believed the Lead and Copper Rule allowed for that type of program. Even though the MDEQ was wrong, that error does not support the allegation that Busch lied to the EPA about the existence of a corrosion control program. Moreover, plaintiffs do not allege that Busch personally knew that Flint was distributing water without corrosion control treatment until April 2015. So even if Busch meant "treatment" when

he said "program" in the February email, the factual allegations do not support the conclusion that he knew the statement was false. In sum, neither that statement nor the various other internal emails in which Busch expressed support for the MDEQ's interpretation of the Lead and Copper Rule or his belief that the water treatment plant was capable of treating Flint River water plausibly demonstrate that Busch created the Flint Water Crisis and then attempted to deceive the public.

*Shekter-Smith.* The allegations likewise fail to demonstrate that Shekter-Smith acted in a conscience-shocking manner. The majority focuses on two of Shekter-Smith's emails.

In the first, Shekter-Smith requested that an EPA official indicate his agreement "that the city [was] in compliance with the lead and copper rule." That, she explained, would help the MDEQ "distinguish between [its] goals to address important public health issues separately from the compliance requirements of the actual rule[.]" The majority's take on that email is that Shekter-Smith cared more about "technical compliance" with the Lead and Copper than addressing an urgent health crisis. Whatever weight Shekter-Smith actually assigned each of those concerns, all that her email exhibits is an attempt to address them separately. This is hardly conscience-shocking conduct.

In the second email, Shekter-Smith responded to a question from Jon Allan, Director of the Michigan Office of the Great Lakes, about the MDEQ's statewide goals related to health-based standards. Under those goals, "98 percent of population [sic] served by community water systems" and "90 percent of the non-community water systems" would be providing "drinking water that meets all health-based standards" by 2020. Allan asked why MDEQ had any goal less than "100 percent," saying, "How many Flints Do you intend to allow???" Shekter-Smith replied:

> The balance here is between what is realistic and what is ideal. Of course, everyone wants 100 percent compliance. The reality, however is that it's impossible. It's not that we 'allow' a Flint to occur; circumstances happen. Water mains break, systems lose pressure, bacteria gets into the system, regulations change and systems that were in compliance no longer are, etc. Do we want to put goal [sic] in black and white that cannot be met but sounds good?

Or do we want to establish a goal that challenges us but can actually be accomplished? Perhaps there's a middle ground?

This second email likewise shows nothing more than Shekter-Smith's concern with meeting agency goals—in this instance, goals related to the statewide administration of safe drinking water. The propriety of certain agency goals, however, falls outside the purview of the Due Process Clause. Indeed, we presume that agency goal-setting consistent with its regulatory duties takes into account "competing social, political, and economic forces" of which judges do not have full view. *Collins*, 503 U.S. at 128. In this instance, Shekter-Smith was apparently seeking to establish a goal that could "actually be accomplished." That concern is not conscience-shocking, regardless of how it sounds in view of what happened in Flint. These two emails, in short, do not demonstrate that Shekter-Smith created the Flint Water Crisis and subsequently attempted to deceive the public.

*Wurfel.* Of all the MDEQ employees, the majority's intentional-public-deception theory really implicates only one individual: Wurfel, the Department's Director of Communications. He is the only MDEQ employee alleged to have made public statements about Flint's drinking water. The majority characterizes Wurfel's statements as attempts to demean, belittle, and aggressively dampen challenges to the government's assertion that Flint's drinking water was safe. But however his statements may be characterized, they were not conscience-shocking.

His first statement came in July 2015, after a reporter broke a story claiming that there was lead in Flint's drinking water. Wurfel publicly responded by saying that "anyone who is concerned about lead in the drinking water in Flint can relax." Then, in September 2015, after two doctors released separate reports about studies showing unsafe levels of lead in Flint residents' water, Wurfel placed the blame for the lead on the service lines in residents' homes even though there was, according to plaintiffs, evidence that at least some residents' service lines were plastic. Wurfel later called the doctors' testing results "perplex[ing]," explaining that they did not match the City's testing results, which he asserted were "done according to state and federal sampling guidelines and analyzed by certified labs." On two other occasions in September, Wurfel asserted the doctors' studies were inaccurate.

Though plaintiffs assert Wurfel's statements were knowing lies, their factual allegations do not support that conclusion. *See Twombly*, 550 U.S. at 555. As plaintiffs' complaint alleges, Wurfel made his public statements after other MDEQ employees represented both that Flint's water treatment plant was prepared to treat Flint River water and that Flint's water testing results showed Flint was in compliance with the requirements of the Lead and Copper Rule. The allegations do not show that Wurfel was given contrary information by any City or State official. Accordingly, plaintiffs do not demonstrate that Wurfel intentionally attempted to deceive the public about the safety of Flint's drinking water or the City's compliance with drinking water laws. At most, they show a mistake of law or fact, made at least in partial reliance on the representations of other State employees. It is certainly unfortunate that Wurfel announced those mistaken beliefs to the public. But that he did so does not strip him of the protection of qualified immunity. *Pearson*, 555 U.S. at 231. Wurfel's handful of statements in July and September do not evince a knowing and intentional attempt to deceive the public about known deficiencies in Flint's water treatment procedures or any conduct designed to intentionally contaminate the public.

The allegations against the MDEQ employees, in sum, do not plausibly demonstrate a callous disregard for or intent to injure plaintiffs, let alone any effort to "systematically contaminate" the Flint community. What they show instead is a series of internal emails and a handful of public statements regarding the requirements of the Lead and Copper Rule and the water's safety. Even if the MDEQ employees made mistakes in interpreting the Rule, those mistakes are not conscience-shocking.[3]

---

[3]Rather than viewing plaintiffs' allegations in a light most favorable to defendants, all this conclusion does is hold plaintiffs to their burden of presenting *factual* allegations that provide a plausible basis for their claim. *Twombly*, 550 U.S. at 555. Plaintiffs do not provide any factual allegations supporting the conclusion that the MDEQ's interpretations were more than mistakes. According to the majority, plaintiffs allege that Shekter-Smith, Busch, and Prysby knew Flint was not in compliance with applicable law because EPA employee Del Toral made that clear in a memorandum that these defendants "ignored and dismissed." But while that memorandum allegedly expressed "concern[]" with Flint's lack of corrosion control and water testing methods, it did not conclude that Flint was in violation of the Lead and Copper Rule. Plaintiffs do not allege that Del Toral or any other EPA official informed the MDEQ that Flint was flouting federal drinking water requirements.

**3**

*Flint Director of Department of Public Works, Howard Croft.* Next, I turn to the allegations against Croft, which come nowhere near the high conscience-shocking standard. Plaintiffs assert that Croft "caused and allowed unsafe water to be delivered to Flint's residents," but they fail to allege that Croft was actually involved in the City's decision to use to the Flint River as a water source or that he played any part in determining whether and when the treatment plant would use corrosion control. The majority finds that single, conclusory allegation sufficient to make the plausible inference that Croft played an affirmative role in approving the transition to the Flint River. What makes that conclusion especially confounding is the majority's simultaneous rejection of allegations against other defendants that are just as conclusory as this one. For example, the majority finds that plaintiffs' allegation that MDHHS executive Nick Lyon "participated in, directed, and/or oversaw the department's efforts to hide information to save face, and to obstruct and discredit the efforts of outside researchers" as the kind of "bare" and "chimerical" assertions *Iqbal* mandates be set aside. But the allegation that Croft "caused and allowed unsafe water to be delivered to Flint's residents" is not any more detailed than the "chimerical" assertion against Lyon. There are only two other allegations against Croft. The first is that, at an unidentified point in time, he said in a press release that the City's water was "of the high quality that Flint customers have come to expect." The second is that in September 2015, he emailed "numerous officials" to inform them that the MDEQ had confirmed Flint's compliance with "EPA standards." These allegations do not demonstrate that Croft engaged in any behavior that may fairly be construed as conscience-shocking.

**4**

*MDHHS executives Nick Lyon and Eden Wells; MDHHS employees Nancy Peeler and Robert Scott; and MDEQ Director Daniel Wyant.* Finally, a brief word about the MDHHS executives, the MDHHS employees, and MDEQ Director Wyant, all of whom the majority correctly dismisses from this case. I agree with the majority that most of the allegations against the MDHHS executives and employees have to do with negligence (i.e., failing to timely notify the public of the possibility of increased lead in the water) rather than any affirmative action

involving them in the decision to use the Flint River as a water source without simultaneously implementing corrosion control treatment. I agree as well that once those allegations are discarded, plaintiffs' remaining allegations—going to these defendants' attempts to "discredit" studies from outside sources—are too sparse to demonstrate conduct rising to the level of conscience-shocking.

And as to MDEQ Director Wyant, I concur with the majority's conclusion that none of plaintiffs' allegations show that he was personally involved with the decision to use the Flint River as a water source or otherwise engaged in any conscience-shocking behavior.

Accordingly, I join the majority in concluding that plaintiffs' allegations against these defendants engaged in conscience-shocking behavior or otherwise infringed on plaintiffs' due process rights.

For all of these reasons, I do not believe plaintiffs' allegations suggest that any individual defendant's actions or failures to act shock the conscience. This presents a significant roadblock that seems to prevent plaintiffs from establishing a violation of substantive due process and thus proceeding past the first prong of the qualified-immunity analysis.

**B**

The second roadblock to plaintiffs' substantive-due-process claim—which also suggests they cannot proceed past qualified immunity's first prong—is that their claim does not appear to arise from the deprivation of a recognized fundamental right to bodily integrity. As should be clear by now, the right reconstructed by the majority is entirely distinct from the one asserted in plaintiffs' complaint and is thus, unsurprisingly, devoid of support from plaintiffs' factual allegations.

So what is the bodily integrity right plaintiffs allege? According to the complaint, defendants' alleged conduct amounted to a failure to protect from exposure to lead-contaminated water. But although plaintiffs frame the claim that way in their complaint, they insist their claim does not flow from a right to receive clean water. Plaintiffs are right to avoid advancing that theory because the Due Process Clause guarantees neither a right to live in a contaminant-free

environment, *Collins*, 503 U.S. at 125–26, nor a fundamental right to water service. *In re City of Detroit*, 841 F.3d 684, 700 (6th Cir. 2016) (quoting *Golden v. City of Columbus*, 404 F.3d 950, 960 (6th Cir. 2005)). Still, it is hard to understand plaintiffs' claim independent from the right to receive clean water. If the Constitution does not guarantee the right to receive clean water on the one hand, how may it guarantee the right not to be exposed to contaminated water on the other?

The majority avoids grappling with that issue by turning, inappropriately, to abstract concepts of personal autonomy and informed consent that it divines from several inapposite cases. In so doing, the majority's analysis runs contrary to the "restrained methodology" outlined by the Supreme Court in *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). To apply that methodology, we look to "concrete examples involving fundamental rights found to be deeply rooted in our legal tradition." *Id.* at 722. Those examples reveal the "outlines of the 'liberty' [interests] specially protected by the Fourteenth Amendment[.]" *Id.* Because the Due Process Clause's substantive component protects only those rights that are an integral part of our "Nation's history and tradition," courts "have always been reluctant to expand" the Clause's coverage into new territory. *Id.* at 720–21. Looking to concrete examples regarding what those historic rights are "tends to rein in the subjective elements that are necessarily present in due-process judicial review." *Id.* at 720, 722.

In *Glucksberg*, the Court showed us how to use that "restrained methodology." There, the Supreme Court dismissed a claim by state physicians that the Due Process Clause guaranteed a right to physician-assisted suicide. *Id.* at 721–24. The physicians argued that recognizing such a right would be consistent with the "self-sovereignty" principles underlying a person's interest in choosing between life and death, which were articulated in *Cruzan v. Missouri Department of Health*, 497 U.S. 261 (1990). *Id.* at 723–24. In rejecting that argument, the *Glucksberg* Court clarified that *Cruzan* assumed, though did not definitively decide, that a competent person had a right to refuse unwanted lifesaving medical treatment. *Id.* at 720. That assumption, however, "was not simply deduced from abstract concepts of personal autonomy." *Id.* at 725. It instead arose from the "common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment[.]" *Id.* The specific right to physician-assisted suicide found no support in the examples outlined in the Court's

jurisprudence or in our Nation's history or traditions and was therefore not protected by substantive due process. *Id.* at 723–24.

Likewise, no concrete examples arising from the established bodily integrity jurisprudence or from our Nation's history or traditions support the right asserted here— protection from policy or regulatory decisions or public statements that, somewhere down the line, result in exposure to contaminated water.

We have previously interpreted the bodily integrity right as "the right against forcible physical intrusions of the body by the government." *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012) (citations omitted). The right is outlined most explicitly in *Rochin v. California*, 342 U.S. 165 (1952). There, the Court held that the Due Process Clause prohibits a state from securing evidence in support of a conviction by using a vomit-inducing solution to forcibly extract the evidence from a suspect's stomach. *Id.* at 172–74. That intrusion on an individual's body, the Court explained, was "too close to the rack and the screw" to be constitutionally permissible. *Id.* at 172. Since then, the Court has concluded that similar types of physically intrusive law enforcement searches implicate the right to bodily integrity. Those include a "compelled physical intrusion beneath [a suspect's] skin and into [the] veins to obtain a" blood sample, *Missouri v. McNeely*, 569 U.S. 141, 148 (2013), and a nonconsensual surgery to retrieve a bullet from a suspect's chest. *Winston v. Lee*, 470 U.S. 753, 767 (1985). In this Circuit, we have concluded that obtaining evidence by "anally prob[ing]" an individual "without his consent" when he was "naked and handcuffed, . . . paralyzed, [and] intubated" was such a grave bodily integrity violation that it rendered the Fourth Amendment search unreasonable. *United States v. Booker*, 728 F.3d 535, 537, 547 (6th Cir. 2013) (citation omitted).

In the medical context, too, the Court has underscored the right's guarantee against direct, physical intrusions into an individual's body at the hands of a government official. In *Washington v. Harper*, for instance, the Court emphasized the significance of an inmate's "liberty interest in avoiding the unwanted administration of antipsychotic drugs." 494 U.S. 210, 221, 223 (1990). *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) affirmed the magnitude of that

liberty interest—avoiding the unwanted administration of drugs—for pretrial detainees as well. Later, in *Cruzan*, the Court explained that the general principles underlying *Harper* and *Riggins* suggested that "a competent person [has] a constitutionally protected right to refuse lifesaving hydration and nutrition." 497 U.S. at 280; *Glucksberg*, 521 U.S. at 720 (explaining that *Cruzan* "assumed, and strongly suggested, that the Due Process Clause protects" such a right without expressly concluding that it did (citing *Cruzan*, 497 U.S. at 278–79)). In the same vein, cases from the Supreme Court and our Circuit suggest that the right to bodily integrity is implicated by government interference with a woman's right to obtain an abortion. *See id.* at 726–27; *Planned Parenthood Sw. Ohio Region*, 696 F.3d at 507.

These cases delineate the contours of the right to bodily integrity in terms of intrusive searches or forced medication. None of them is compatible with the "careful description" of the right at issue here: protection from exposure to lead-contaminated water allegedly caused by policy or regulatory decisions or statements.[4] Even the few district court or sister circuit cases cited by the majority do not clarify the contours of plaintiffs' alleged right. All except one of those cases deal with medical professionals performing government-sponsored invasive procedures or harmful experiments on unsuspecting patients.[5] The last one deals with police

---

[4]Even *In re Cincinnati Radiation Litigation*, 874 F. Supp. 796 (S.D. Ohio 1995), the one district court case the majority finds "especially analogous," fails to close the gap. There, the court concluded that government officials violated medical patients' right to bodily integrity by devising a program that subjected unwitting cancer patients to high doses of radiation under the guise of performing cancer treatment. *Id.* at 803–04. But whether the Due Process Clause protects hospital patients from being intentionally subjected to harmful medical treatment without their consent is not the determinative issue here. What we should care about is whether and when it protects an indeterminate number of public citizens from certain regulatory decisions or statements that have some impact on the quality of public drinking water or any other environmental resource.

[5]*Barrett v. United States*, 798 F.2d 565 (2d Cir. 1986) (state psychiatric hospital administered injections of a synthetic mescaline compound furnished by the Unites States as part of an experimental program that tested the suitability of the substance as a chemical warfare agent); *Lojuk v. Quandt*, 706 F.2d 1456 (7th Cir. 1983) (Veterans Affairs psychiatrist subjected patient to electroconvulsive therapy without the patient's consent); *Rogers v. Okin*, 634 F.2d 650 (1st Cir. 1980), *overruled on other grounds sub nom*, *Miss v. Rogers*, 457 U.S. 291 (1982) (state administered antipsychotic drugs to both voluntary and involuntary patients at state mental health facilities); *Heinrich v. Sweet*, 62 F. Supp. 2d 282 (D. Mass. 1999) (U.S. Government conspired with health institutions to conduct "extensive, unproven and dangerous medical experiments on over 140 terminally ill patients, without their knowledge or consent"); *Stadt v. Univ. of Rochester*, 921 F. Supp. 1023 (W.D.N.Y. 1996) (government physicians injected patient with plutonium without her knowledge or consent); *In re Cincinnati Radiation Litigation*, 874 F. Supp. 796 (S.D. Ohio 1995) (government and university physicians subjected cancer patients to radiation experiments without their knowledge under the guise that they were receiving cancer treatment); *Davis v. Hubbard*, 506 F. Supp. 915 (N.D. Ohio 1980) (inadequate medical treatment).

officers who coerced individuals to ingest marijuana while those individuals were under the officer's control.[6]   So those cases further elaborate the ways in which medical or law enforcement personnel may interfere with an individual's right to bodily integrity.  But they say nothing about how non-custodial policy or regulatory decisions or statements affecting the quality of an environmental resource may do so.  In short, neither our Nation's history and traditions nor governing bodily integrity jurisprudence suggests that the conduct alleged here is comparable to a "forcible physical intrusion[] of the body by the government."  *Planned Parenthood Sw. Ohio Region*, 696 F.3d at 506.  "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it."  *Reno v. Flores*, 507 U.S. 292, 303 (1993).

In sum, because the conduct alleged does not appear to rise to the level of conscience-shocking, and because I believe it does not demonstrate the deprivation of a recognized fundamental right, I have serious doubts about whether plaintiffs state a substantive due process claim sufficient to carry them past prong one of the qualified-immunity analysis.

### III

The second prong of the qualified-immunity analysis looks to whether the alleged constitutional right was "clearly established" at the time the government official acted.  *al-Kidd*, 563 U.S. at 735.  This presents the most fundamental problem for plaintiffs' case.  To the extent plaintiffs do successfully allege the violation of a constitutional right, the novelty of that right just shows that it was not clearly established at the time the alleged events unfolded.  Therefore, the doctrine of qualified immunity shields every defendant from suit.

For a right to be clearly established, its contours must be "sufficiently clear that every reasonable official would have understood that *what he is doing* violates that right[.]"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasis added) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Because "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established," we look to how existing precedent applies to each

---

[6]*Bounds v. Hanneman*, 2014 WL 1303715 (D. Minn. Mar. 31, 2014) (officers forced plaintiffs to ingest a substantial amount of marijuana, against their will, in order to observe how they would react).

defendant's actions in the "specific context of the case" before us. *Id.* at 308 (internal quotation marks and citation omitted). Plaintiffs must be able to "identify a case with a similar fact pattern" to this one "that would have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Identifying a factually similar case is especially important in the realm of substantive due process, where the inherent ambiguity of what the law protects is best discerned through "carefully refined . . . concrete examples[.]" *Glucksberg*, 521 U.S. at 722.

Here, that means plaintiffs must be able to point to controlling cases extending substantive due process protections to the following individuals:

- A high-level government executive who makes a decision (or proceeds with a project) while relying on expert opinions that the decision or project is lawful and safe (Earley and Ambrose).

- A regulator who misinterprets environmental laws and provides bad advice to government policymakers (MDEQ employees).

- A city or state regulator who, based on the erroneous advice of other regulators, publicly announces that a government-provided resource is safe for consumption when it is not (Wurfel, Croft, or others who made public statements).

As the majority acknowledges, plaintiffs point to no factually similar controlling case in which a court found that such conduct violated a constitutional right to bodily integrity. "This alone should have been an important indication to the majority that [the defendants'] conduct did not violate [plaintiffs'] 'clearly established' right." *White*, 137 S. Ct. at 552.

In fact, in case after case around the country, courts have consistently rejected substantive-due-process claims based on the type of conduct alleged here. *Branch v. Christie* is one such case. 2018 WL 337751 (D.N.J. Jan. 8, 2018). *Branch* dealt with a bodily integrity claim brought by parents of New Jersey public school children against several state officials for "knowingly expos[ing] the children . . . to water that was contaminated with unsafe levels of lead," and "concoct[ing] a scheme to cover up the health hazard." *Id.* at *1. The parents said that state employees caused the lead contamination by "cancel[ling] work orders to change outdated and lead-saturated filters," and "allowing several filters to be used for upwards of five

years." *Id.* (internal quotation marks and citation omitted). Once the public became aware of the unsafe lead levels in the school's drinking fountains, state employees "undertook a course of providing misinformation to parents, telling the community that the water was safe." *Id.* (internal quotation marks and alterations omitted). The *Branch* court dismissed the parents' claims, finding "no authority" supporting their bodily integrity theory. *Id.* at \*8. As the court explained, "[t]he liberty interest in bodily integrity guarantees the 'right generally to resist enforced medication,' the right to be 'free from medical invasion,' and the right to an abortion," but "*not* to guarantee . . . a right to minimum levels of safety" or protection from contaminated water. *Id.* at \*7 (citations omitted).

Here, as in *Branch*, government officials allegedly exposed others to water contaminated with lead. And here, as in *Branch*, certain government officials allegedly attempted to hide the lead contamination. The *Branch* court could find no authority indicating that such conduct violated a substantive due process right—not even the Supreme Court's bodily integrity cases were close to on point. That court's conclusion shows how unclear it would have been for the regulators and policymakers in this case to have anticipated that their actions might have violated an established bodily integrity right.

*Coshow v. City of Escondido*, a state court case, also sheds light on the novelty of plaintiffs' asserted right. 132 Cal. App. 4th 687 (Cal. Ct. App. 2005). There, the California Court of Appeals rejected residents' bodily integrity claims against the City of Escondido and California's Department of Health Services over their decision to add fluoride to public drinking water. *Id.* at 698. The residents asserted that adding fluoride to the water exposed the public to unnecessary health risks. *Id.* But the court held that, just as the Constitution did not guarantee any "right to a healthful or contaminate-free environment," it likewise did not guarantee a right to receive fluoride-free drinking water from the City. *Id.* at 709–10. This was so even though the fluoride might have contained "trace levels of lead and arsenic[.]" *Id.* at 700. The court reasoned that the residents' claim came down to an asserted right to receive "public drinking water of a certain quality." *Id.* at 708–09. And it held that the "mere novelty" of that claim indicated it was not "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987)). Accordingly,

the court held that the right to fluoride-free drinking water was not protected by substantive due process. *Id.*

Just as in *Coshow*, the novelty of plaintiffs' claim here shows that it is not clearly established. The majority attempts to draw a disingenuous distinction between this case and *Coshow*. It reasons that, in *Coshow*, adding fluoride to drinking water served the beneficial purpose of preventing tooth decay while, in this case, adding lead to water served no countervailing governmental interest. I certainly do not quibble with the premise that adding lead to water furthers no discernable beneficial purpose. But that is not what happened here. No government official made a conscious decision to introduce lead into Flint's water. Instead, the Emergency Managers made a conscious and legitimate policy decision to switch to the Flint River as a water source to cut costs—and they did so in reliance on guidance from engineering firms and the MDEQ. That hardly demonstrates that the decision to switch to the Flint River was made with no countervailing governmental interest in mind. The government officials' resource-allocation decisions during a budgetary crisis did not constitute obvious violations of the right to bodily integrity because of the grave health consequences they allegedly caused in hindsight.

Moreover, that some governmental officials made public statements about the safety of Flint's water does not make the unlawfulness of any defendant's conduct any more obvious. As the Second Circuit put it, "no court has ever held a government official liable for denying substantive due process by issuing press releases or making public statements"—regardless of whether the public statements were true or false. *Benzman v. Whitman*, 523 F.3d 119, 125, 127 (2d Cir. 2008) (rejecting residents' substantive due process claims against EPA officials for making "substantially exaggerated" statements regarding air quality after the September 11 terrorist attacks). *Benzman* invoked the principles underlying a similar post-September-11 case, *Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007). In *Lombardi*, workers who performed search, rescue, and clean-up services at the World Trade Center site in the aftermath of the terrorist attacks alleged that the EPA violated their right to bodily integrity by falsely assuring them that it would be safe to work without respiratory protection. *Id.* at 74. Relying on those assurances, several workers went without that protection and later suffered adverse health effects. *Id.* at 75. Without definitively deciding whether the alleged false assurances interfered with the workers'

fundamental right to bodily integrity, the court found that they were nevertheless not conscience-shocking. *Id.* at 82–83. In so deciding, the court expressed concern with imposing broad constitutional liability on EPA officials for making false statements in the course of fulfilling the agency's mission. The court reasoned that "the risk of such liability will tend to inhibit EPA officials in making difficult decisions about how to disseminate information to the public in an environmental emergency." *Id.* at 84. Accordingly, absent any allegation of an intent to harm, the court declined to extend substantive due process to cover what was "in essence a mass tort for making inaccurate statements." *Benzman*, 523 F.3d at 127–28.

This case implicates similar, albeit not identical, concerns to those invoked in *Lombardi* and *Benzman*. As the majority points out, there is no allegation that any defendant here intended to harm a Flint resident. And like the EPA regulators in *Lombardi* and *Benzman*, Wurfel made public statements pursuant to his official role as MDEQ's Director of Communications. To be sure, those statements countered evidence about Flint water's lead levels presented in two separate outside studies. But they were also consistent with information provided to Wurfel by officials from his own department. That information was, in retrospect, misguided. Plaintiffs do not assert, however, that Wurfel made any knowingly false statements for the purpose of causing harm. The same goes for Croft. When he issued a press release asserting that Flint's water was of a "high quality," at least one engineering firm and the MDEQ had concluded that the water treatment plant was capable of adequately treating Flint's water. In other words, the allegations do not show that Croft made a knowingly false public statement for the purpose of causing harm. Given the absence of any such allegation, and because no court has ever concluded that the Due Process Clause covers the public statements of government officials, it can hardly have been apparent to Wurfel or Croft that their statements clearly violated plaintiffs' due process right to bodily integrity.

Due to the lack of controlling precedent and the many cases suggesting substantive due process does not protect plaintiffs' asserted right, the majority again falls back on its exaggerated characterization of defendant's actions and statements, likening them to the "systematic" poisoning of an entire community. Advancing that narrative, the majority concludes that this case is one of the "easy" ones that should never have arisen in the first place. *See United States*

*v. Lanier*, 520 U.S. 259, 271 (1997). "Of course, in an obvious case, [general] standards," (or reasoning) "can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citation omitted). But this is not one of those cases. As already demonstrated, the majority's systematic poisoning narrative has no basis in plaintiffs' factual allegations.[7] This is not a case about a government official knowingly and intentionally introducing a known contaminant into another's body without that person's consent. It is a case about a series of erroneous and unfortunate policy and regulatory decisions and statements that, taken together, allegedly caused plaintiffs to be exposed to contaminated water.

The proper framing of the factual narrative exposes how far off base are the bodily integrity cases relied upon by the majority. How could those cases have provided any practical guidance to government officials like Earley, Ambrose, Croft, or the MDEQ employees? For instance, how should *Rochin*'s prohibition against induced vomiting to obtain evidence have informed Earley's oversight of the switch from the DWSD to the Flint River and what professional opinions he was entitled to rely upon when the City made the switch? And how should it have informed Ambrose's decision to continue using the Flint River as a water source and what professional opinions he was entitled to rely upon in doing so? What about the MDEQ employees? How should *Riggins*'s limits on the state's ability to administer antipsychotic drugs to pretrial detainees have changed what kind of advice the MDEQ employees gave the City about federal corrosion-control requirements? Or what about the fact that *Cruzan* allows a state

---

[7]What is more, the majority's exaggerated narrative runs contrary to what is publicly known in the aftermath of the Flint Water Crisis. For instance, plaintiffs point out that the state has brought criminal charges against various defendants and ask us to take judicial notice of those charges as providing context for their bodily integrity claim. Of course, I agree with the majority that it is inappropriate to consider those charges for the purpose of deciding plaintiffs' constitutional claim. But I note that even if it were appropriate to consider them, the charges would not support plaintiffs' assertion that defendants' conduct is so obviously unlawful that qualified immunity does not shield them from plaintiffs § 1983 suit. In fact, they prove just the opposite. If the defendants' actions are obviously unlawful, then one would expect relatively speedy probable-cause determinations. Reality suggests otherwise. Consider this: the state issued its complaint against Lyon on June 14, 2017, but the court did not find probable cause to bind him over for trial until August 24, 2018. In the meantime, the trial judge spent around 11 months on preliminary examinations just to find probable cause existed. Other defendants, such as MDEQ Employee Shekter-Smith and MDHHS Executive Peeler, have not even been bound over yet, despite the state filing complaints against them as early as July 2016. These cases have languished unusually long in probable cause proceedings. That alone suggests that the egregiousness of defendants' actions is not so apparent as the majority makes it out to be.

to demand clear and convincing evidence that an incompetent patient no longer desires life support before cutting it off? How should that have influenced the content of Wurfel's (or any other defendant's) public statements about the water's quality? The answer to these questions is—clearly—not established.

And although the right plaintiffs allege is not established, various courts have certainly considered it—and rejected it. *See Branch,* 2018 WL 337751; *Coshow,* 132 Cal. App. 4th 687; *Benzman,* 523 F.3d 119; *Lombardi*, 485 F.3d 73.[8] But ignoring those cases, the majority turns, curiously, to a few federal and state cases arising from the Flint Water Crisis itself. The majority begins its opinion with the proclamation that it joins a few decisions concluding that some of these same defendants, and some others, violated various Flint residents' substantive due process rights. Those cases offer weak support for the majority's position. Oddly, one of the decisions it cites is the very case before us on appeal, *Guertin v. Michigan*, 2017 WL 2418007 (E.D. Mich. June 4, 2017). The second is authored by the same judge as authored *Guertin*, and its bodily integrity analysis block-quotes more than 2,000 words from the *Guertin* analysis. *In re Flint Water Cases*, 329 F. Supp. 3d 369, 397–400 (E.D. Mich. 2018), *vacated on other grounds* (Nov. 9, 2018). And that case appears to follow the same analytical errors as the state case to come before it—that is, just like the state case, it makes several logical leaps to conclude that policy and regulatory decisions and statements are on par with an intentional introduction of a contaminant into another's body. *Mays v. Snyder*, 916 N.W.2d 227 (Mich. Ct. App. 2018); *Mays v. Snyder*, No. 16-000017-MM (Mich. Ct. Cl. Oct. 26, 2016). These few cases and their

---

[8]The number of cases rejecting similar environmentally based claims is significant. *See Kaucher v. Cty. of Bucks*, 455 F.3d 418, 420, 428–30 (3d Cir. 2006) (rejecting a substantive-due-process claim by corrections officials who contracted a disease allegedly due to the jail's unsanitary conditions and provision of false and misleading information about the extent of the sanitary problem); *Walker v. City of E. Chicago*, No. 2:16-cv-367, 2017 WL 4340259, at *6 (N.D. Ind. Sept. 29, 2017) (rejecting a substantive-due-process claim that the government allowed a housing authority to "build and operate public housing in an area with contaminated soil, thus increasing their risk of injury"); *In re Camp Lejeune N. Carolina Water Contamination Litig.*, 263 F. Supp. 3d 1318, 1325, 1359 (N.D. Ga. 2016) (rejecting a substantive-due-process claim by service members against government officials at the Marine base where they lived based on the officials' failure to monitor water quality and notify service members of the presence of toxic substances in the water); *Naperville Smart Meter Awareness v. City of Naperville*, 69 F. Supp. 3d 830, 839 (N.D. Ill. 2014) (rejecting a substantive-due-process claim by residents of a city asserting that radio frequency waves emitted by "smart meters" that the city installed in their homes posed health risks); *J.S. ex rel. Simpson v. Thorsen*, 766 F. Supp. 2d 695, 712 (E.D. Va. 2011) (rejecting a substantive-due-process claim brought by an elementary student that school officials knowingly concealed the school's mold problems to the detriment of the student's health).

redundant analyses provide a weak foundation on which to build a new bodily integrity jurisprudence.

In sum, the majority's opinion is a broad expansion of substantive due process, which contradicts the traditional understanding that due process does not "supplant traditional tort law" or impose a duty on the government to ensure environmental safety. *Collins*, 503 U.S. at 126 (citation omitted). What is more, it effectively "convert[s] the rule of qualified immunity . . . into a rule of virtually unqualified liability" for government officials making policy or regulatory decisions or statements that have any effect on a publicly consumed environmental resource. *White*, 137 S. Ct. at 552 (ellipses in original) (citation omitted). That turns qualified immunity on its head.

**IV**

The majority's conclusion that the defendants violated plaintiffs' clearly established right to bodily integrity has some facial appeal, of course, because we sympathize with the Flint residents' plight. It is wrong, however, on both the facts and the law. For all of the above reasons, I join the majority in its denial of sovereign immunity to the City of Flint and in dismissing various defendants from the case. But I dissent from its denial of qualified immunity to Earley, Ambrose, Croft, Shekter-Smith, Busch, Prysby, and Wurfel.